QUANTUM DEVELOPMENT CORPORATION, Bankrupt
AMERICAN FIDELITY FIRE INSURANCE COMPANY, Plaintiff

v.

CHARLES JOY, RECEIVER
ALBERT C. LANG, TEMPORARY RECEIVER
FIRST NATIONAL CITY BANK, Defendants

ALBERT C. LANG, TRUSTEE and AMERICAN FIDELITY FIRE
INSURANCE COMPANY, Plaintiffs

v.

THE BANK OF NOVA SCOTIA, Defendant

No. 5-1972

District Court of the Virgin Islands

Div. of St. Croix

July 24, 1975

ELLISON & HOLMES, ESQS., WILLIAM T. HOLMES, ESQ. (LEO HIRSCH, of counsel), Christiansted, St. Croix, *for American Fidelity Fire Insurance Co.*

ISHERWOOD, COLIANNI, ALKON & BARNARD, ESQS. (JAMES H. ISHERWOOD, of counsel), Christiansted, St. Croix, *for Bank of Nova Scotia*

LOUD & CAMPBELL, ESQS. (ROGER CAMPBELL, of counsel), St. Thomas, V.I., *for First National City Bank*

ROSSKOPF & DEMA, ESQS. (JOHN K. DEMA, of counsel), Christiansted, St. Croix, V.I., *for Trustee in Bankruptcy*

YOUNG, *District Judge*

### MEMORANDUM OPINION AND JUDGMENT

### I

### BACKGROUND FACTS

Plaintiff American Fidelity Fire Insurance Company ("AFFIC"), Surety of the bankrupt Quantum Development Corporation ("Quantum"), brings this action to recover from the defendants Bank of Nova Scotia ("BNS") and First National City Bank ("Citibank") certain moneys, former bankruptcy funds to which AFFIC has become entitled by subrogation, which were embezzled

by Quantum's original bankruptcy receiver, Mr. Charles Joy.

## A.

### FACTS AS TO BNS

In compliance with an Order of this Court dated March 21, 1973, pursuant to which AFFIC was to deliver a certified check in the amount of $84,858.00 to the Clerk of the District Court of the Virgin Islands on or before March 30, 1973, Surety caused that amount to be transferred by wire to Chase Manhattan Bank in San Juan, Puerto Rico, for the account of Benitez and Associates, Inc. ("Benitez"), an authorized agent of AFFIC. Because Benitez was unable to obtain a certified check on its account in sufficient time to meet this Court's deadline, it obtained a certified check of Builders Insurance Company, a corporation affiliated with Benitez. Such action on the part of Benitez was subsequently ratified by AFFIC, its principal. Benitez instructed Builders to issue the check to the order of "Charles R. Joy, Receiver". The check was thereupon delivered by an AFFIC attorney to the Clerk of this Court. A receipt was issued for the check, and it was then turned over to Charles Joy.

Prior to this time, Bankruptcy Judge Rivera-Cruz instructed Joy to put the bulk of the $84,858.00 into certificates of deposit at the highest rate available and to open a small checking account with the balance. Joy then telephoned a number of banks in the Virgin Islands to obtain the current interest rates on certificates of deposit. On March 30, 1973, he was quoted a rate by the Bank of Nova Scotia. Several days later, on April 2, 1973, he took the check to Bank of Nova Scotia where he met William Chandler, then manager of the Christiansted branch of the bank. At trial, Mr. Chandler testified that prior to April 2, 1973, he had read about Quantum bankruptcy in the

newspapers and had known Charles Joy only casually. During the April 2nd conversation, Joy requested certificates of deposit in the amount of $75,000.00 and further stated that he wished to open a checking account. Mr. Chandler noted that the check was payable to "Charles R. Joy, Receiver", but denied having seen the endorsement on the reverse side of the check, which read:

> For Deposit in Quantum Acct. Quantum Bankruptcy Charles R. Joy.

Without referring to the form of the endorsement, Mr. Chandler then instructed his secretary to prepare the CD's in the manner requested by Mr. Joy. The CD's were ultimately issued in the name of "Charles R. Joy" without words which might denote his representative capacity.

Several weeks later, Joy called Chandler to inform him that a countersignature would thereafter be required on the checking account, and that Judge Rivera-Cruz would be coming into the bank to provide a specimen of his signature. Sometime between May 1st and the 18th, Judge Cruz went to the bank, accompanied by Mr. Joy, for that stated purpose. During the visit, Judge Cruz informed Chandler that this was a Quantum bankruptcy account; that although Mr. Joy, as Receiver, was the true customer, he wanted some control over the account. Critical at this juncture is whether the countersignature was placed only on the checking account or upon all Quantum transactions. Judge Cruz testified that at the time, he was not aware that Joy had already put the money into certificates of deposit, and that he did not mention anything to Mr. Chandler regarding the CD's specifically. In his recollections of his encounter with Judge Cruz, Chandler stated that the Quantum bankruptcy was never mentioned, but that the judge's presence indicated to him that bankruptcy funds were involved. Chandler denied that Judge Cruz placed any

countersignature requirement on the CD's but admitted in an earlier deposition that he assumed the same restriction would apply to the CD's as well as the checks. He spoke to no one in the bank's CD department of this assumption, and took no steps to ensure that the CD's would be similarly restricted.

The legend, "All cheques to be countersigned by Judge Cruz", was typed on the current ledger of the checking account, was carried forward to a few subsequent ledger sheets and was then omitted. Mr. Chandler left the Christiansted Branch of BNS on May 18, 1973, to become Manager of a branch of the same bank in Halifax, Nova Scotia.

On October 2, 1973, upon maturity of the three certificates of deposit, BNS issued to "Mr. Charles R. Joy" individually a check for $77,664.54, representing the principal sum plus $2,664.54 of interest thereon. With these funds, Joy, on October 2, bought a certificate of deposit, due December 1, 1973, in his individual name from Citibank. This CD was cashed by Joy on December 3, 1973.

On October 16, 1973, BNS certified a $12,000.00 check drawn by Joy to his own order and countersigned, as per restrictive endorsement, by Judge Cruz. The check was later endorsed by Joy and cashed at Citibank in Christiansted.*

## B

### FACTS AS TO CITIBANK

The trial of this case commenced January 18, 1974, before Bankruptcy Judge Rivera Cruz. During the course of the trial, it became evident that Judge Cruz would become a witness in the case, and the matter was concluded before me on April 2, 1975.

---

* Because BNS properly attached a countersignature requirement to the checking account and the $12,000.00 check was indorsed in accordance therewith, AFFIC makes no claim for this amount.

Pursuant to an Order of this Court dated April 13, 1973, wherein Behrens Mortgage Company was directed to pay to Charles Joy $115,211.00 in retainages on the Croixville construction project upon the final closing thereof, Behrens on September 7, 1973, issued a check in that amount to the order of:

Charles R. Joy, Receiver Quantum Development Corporation VI No. 5-1972 In Bankruptcy Pursuant to Court Order of April 13, 1973.

Several days later, on September 10, Joy discussed the purchase of a certificate of deposit with Lawrence J. Cavanaugh, manager of the Christiansted Branch of Citibank. Mr. Joy noted that he had his personal account in the Sunny Isles branch of Citibank, and after Mr. Cavanaugh quoted an interest rate of 10¾%, an application was prepared for the CD. The check was endorsed "Charles Joy Receiver Quantum Corp.", and the application was made out in favor of "Charles R. Joy, Receiver". The application was then delivered to Mrs. Bailey, Cavanaugh's secretary, with instructions to prepare the CD. All terms of the CD, as made out by Mrs. Bailey, conformed to the application, except that the CD was made out in favor of "Charles R. Joy", with the word "Receiver" omitted. Mrs. Bailey's only explanation for the foregoing omission was: "As far as I know it was just a typographical error". Mr. Cavanaugh then signed the CD.

This certificate of deposit dated September 10 and in the amount of $115,211.00 was automatically renewed upon maturity on November 12 for an additional sixty days, and a $2,131.71 check, representing interest for the initial sixty-day period, was issued to Joy. On or about October 12, 1973, Mr. Cavanaugh went on leave from the bank and Mr. Chardon became Acting Manager of the Christiansted Branch. On November 19, Joy informed Mr. Chardon that

he did not wish the CD renewed, that he wanted both the interest check and the CD cashed (representing a total of $117,571.51), and the proceeds therefrom cabled to City National Bank of Miami and made payable to himself.

Sometime thereafter, Charles Joy absconded with both the $117,571.51 and the $89,664.54 discussed in Part IA, supra, and no part of these sums has ever been returned to Joy's successors. On September 11, 1974, a judgment was entered by this court in favor of Mr. Tait, as Trustee, against Joy in a conversion action in the sum of $196,623.26 plus interest. This judgment remains wholly unsatisfied.

It is uncontroverted in the record before this Court that neither Mr. Chandler at BNS nor Messrs. Cavanaugh and Chardon at Citibank had ever opened bankruptcy accounts for trustees or receivors in bankruptcy; that none knew whether his bank was a designated depository for bankruptcy funds; and that none had knowledge of the statutes requiring banks to be so designated prior to the acceptance of such funds.

## II

### LIABILITY OF BNS

Plaintiff Surety predicated its claim of recovery against BNS on three distinct legal theories: (1) that a bank not a designated depository for bankruptcy funds who nonetheless receives such deposits may become a trustee ex maleficio for the funds; (2) that a countersignature requirement was placed on the CD's, and the failure of BNS to abide by the restrictive endorsement renders it liable; and (3) that BNS issued the CD's contrary to instructions.

### (1)

█ Plaintiffs' initial claim requires an analysis of the Fourth Circuit decision in American Surety Co. v. First

National Bank, 141 F.2d 411 (4th Cir.), cert. denied, 322 U.S. 754 (1944). In that case, a lawyer became trustee of a bankrupt estate and deposited funds belonging to the estate in a bank which was not a designated depository under the Bankruptcy Act. The lawyer, who maintained a personal account with the defendant bank, gradually embezzled the bankruptcy moneys until the fund was entirely exhausted. In concluding that the bank became a trustee ex maleficio of the amount so received and thus liable therefor as a trustee to the bankrupt estate, the Court grounded its decision on those provisions of the Bankruptcy Act which forbid the deposit of bankruptcy funds in a bank which is not a designated depository. See Bankruptcy Act, § 47(a), 11 U.S.C. § 75(a); § 61, 11 U.S.C. § 101; General Orders §§ 29, 53(5). There is no doubt that by virtue of such unauthorized deposit alone, the trustee in bankruptcy becomes guilty of a breach of his trust. Id. at 413. The important issue for purposes of the instant case, however, is under what circumstances the bank joins in the trustee's breach.

In its memorandum to the Court, plaintiff suggests that the liability of BNS, which all parties agree was not a designated depository in April of 1973, should be based upon its acceptance of the funds *alone*, on the ground that the bank is imputed with the knowledge of the terms of the Bankruptcy Act and the general orders promulgated thereunder. To begin with, this notion was specifically discredited in the case of Rodgers v. Bankers' National Bank, 229 N.W. 90 (Minn. 1930); and secondly, in light of the Fourth Circuit's finding in American Surety that the bank's officers had *actual knowledge* of the breach of trust of which the trustee was guilty in making the deposit, such notion would be dictum.

The leading treatise in the field of bankruptcy, appar-

ently in accord with the view expressed in Rodgers, supra, states that:

> where a bank is *not* a designated depository, § 61 and General Order 29, as well as § 47A(2) are not intended to define the liability of a bank generally having business relations with trustees or receivers in bankruptcy. These provisions are said to be directed to designated depositories and the bankruptcy receivers and trustees; hence, the law applicable generally to a bank receiving deposits of fiduciary funds controls, even though the funds belong to a judicial or official trust and their deposit is in violation of a law defining the duties of the proper custodians. Consequently, such a bank is not liable for the dissipation of funds deposited by a trustee contrary to the Act and General Orders, merely because of its acceptance of such a fiduciary deposit.

3A Collier on Bankruptcy, ¶61.04 (14th ed. 1974); see also Rodgers, supra at 95–96.

On its face, American Surety appears to hold that the mere receipt of bankruptcy funds by a bank not a designated depository renders it liable. A closer scrutiny of the decision, however, reveals that no such reading of the decision was intended. The law on which the Court based its decision was the Restatement of the Law of Torts, section 324, comment b, which reads:

> If a trustee commits a breach of trust in depositing trust funds in a bank *and the bank when it receives the funds has notice of the breach of trust,* the bank is liable for participation in the breach of trust, and is chargeable as a constructive trustee of the funds.
>
> Thus, if a bank receives on deposit that *which it knows are trust funds and it knows that the trustee is forbidden by the terms of the trust to deposit in the bank,* it is liable for participation in the breach of trust, and is chargeable as to a constructive trustee of the funds deposited.

American Surety, supra at 413 (emphasis added).[1] After isolating the legal standard under which it was to proceed,

---

[1] The law as stated in Section 324 of the Restatement of Trusts (First) remains substantially unchanged by Section 324 of the Restatement of Trusts (Second), the controlling law in the Virgin Islands today.

the Fourth Circuit then made factual findings that not only did the bank know the nature of the funds deposited with it (i.e., bankruptcy funds) but also that such deposit was illegal. Id. at 413–14. For, "[t]he cashier was an experienced banker and knew of the restrictions applicable to the deposit of bankruptcy funds." Id. at 414.

Although Mr. Chandler testified at trial that he did not know the funds were bankruptcy funds until sometime after the funds had been deposited, such notice can unquestionably be imputed to him by the endorsement on the back of the $84,858.00 check presented to him by Charles Joy on April 2, 1973. I cannot find, however, that Chandler or anyone else at BNS had knowledge of the illegality of the deposit. It is entirely conceivable that no one at BNS would have been familiar with the relevant provisions of the Bankruptcy Act or the limitations on deposits of bankruptcy funds. Indeed, there was in fact no designated depository for bankruptcy funds in the Virgin Islands in April of 1973. Furthermore, on the authority of Rodgers v. Bankers' National Bank, supra, I cannot impute such knowledge to BNS. Id. at 95–96. Cf. In re Bogena & Williams, 76 F.2d 950, 953 (7th Cir. 1935).

## (2)

Plaintiff's second theory of liability is predicated on the factual assumption that a countersignature requirement was placed on the CD's as well as the checking account. This contention is not supported by the facts. In light of the fact that Judge Cruz was not even aware that Joy had already purchased CD's at BNS, it is inconceivable that such requirement would have been placed thereon by him. The testimony of Chandler supports this view. Even had Judge Cruz made an offhand reference to "funds" or "trust funds", I find that such direction is not clear or specific enough to restrict the endorsements on the three

103

CD's. In order to impose liability on a bank for its failure to abide by a restrictive endorsement, the limitation must be imposed by clear direction rather than ambiguity or surmise. See, e.g., Citizens National Bank v. Hill, 505 S.W.2d 246, 248 (Tex. S.Ct. 1974).

## (3)

 Plaintiff's final claim focuses on the alleged failure of BNS to issue the CD's in accordance with the instructions given it by Charles Joy. As heretofore noted, the check which Joy presented to Mr. Chandler was payable to "Charles R. Joy, Receiver", and bore on the back the indorsement "For Deposit In Quantum Acct. Quantum Bankruptcy Charles R. Joy". A perusal of section 3—205 of the Uniform Commercial Code,[2] intended to provide a functional definition of the term "restrictive indorsement", leaves little doubt that the foregoing fits within the prescription:

> An indorsement is restrictive which either . . . (c) includes the words "for collection", *"for deposit"*, "pay any bank", or like terms signifying a purpose of deposit or collection; or (d) otherwise states that it is for the benefit or use of the indorser or of another person.

11A V.I.C. § 3—205 (emphasis added). Under either subdivision (c) or (d), the $84,858.00 presented to BNS bore a restrictive indorsement. In addition to stating "For Deposit", the indorsement clearly indicates that it was for the benefit or use of the Quantum bankruptcy estate.

 The recognized purpose of a restrictive indorsement is to restrict the use to which the indorsee may put the proceeds of the instrument when a party pays them to the indorsee. No section of the Uniform Commercial Code

---

[2] The Uniform Commercial Code has been applied in bankruptcy proceedings [see In re United Thrift Stores, 363 F.2d 11, 14 (3d Cir. 1966)], and is generally considered to be the federal law of commerce. See In re King-Porter Co., 446 F.2d 722, 732 (5th Cir. 1971).

specifically requires an indorsee-bank to examine the restriction and to ensure that its payment is not inconsistent therewith; nor does any provision set forth any liability on the part of a bank for payment inconsistent with a restrictive indorsement. But, despite the absence of any explicit reference thereto, such duty and resulting liability for the failure to carry out such duty can be fairly inferred from a number of Code sections.

Section 3—206(2), for example, permits an intermediary bank, or a payor bank *which is not the depository bank*, to disregard any restrictive indorsement except that of the bank's immediate transferor. Subdivision (3) of the same section requires any transferee other than an intermediary bank to act consistently with the purpose of collection. It is clear that under the facts of the instant case, BNS stands in the position of a depository rather than an intermediary bank. See 11A V.I.C. § 4—105(a). Thus, at least by negative implication, section 3—419(4) of the Code provides a remedy in conversion against a depository bank who fails to pay or apply proceeds in accordance with the terms of a restrictive indorsement. See Salsman v. National Community Bank, 246 A.2d 162, 169 (N.J. Super. 1968), aff'd. 251 A.2d 460 (N.J. App. 1969). Subdivision 3 of section 3—419 further implies the liability of a depository bank in conversion when it deals with an instrument or its proceeds on behalf of one who is not the true owner, where the bank does not act in accordance with "reasonable commercial standards". Id. at 168. By his own admission, Mr. Chandler never examined the indorsement on the check, which indorsement was made in his presence. Instead, he merely instructed his secretary to make out the CD's in accordance with Mr. Joy's wishes. Certainly, such actions on the part of BNS's branch manager do not comport with reasonable commercial standards. The very least Chandler could have done

was to ensure that the inscription on the CD's corresponded to that on the original check. Although he noticed that the check was made out to Joy in his representative capacity, Chandler made no effort to ascertain for whom Joy was a receiver.

Moreover, section 3—603 of the Code, adopting the general principle that a payor is not required to obey a stop payment order received from an indorser, makes an explicit exception in the case of a depository bank which satisfies the holder of an instrument which has been indorsed in a manner inconsistent with the terms of such restrictive indorsement. See 11A V.I.C. § 3—603(1)(b).

■ Finally, the drafters of the Code provided for circumstances which may not have been specifically covered in their statutory scheme. Section 1—103 states in pertinent part: "Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant . . . shall supplement its provisions." It thus follows that an enumeration by the Code of Acts which constitute a conversion is not exclusive, and the general principles of law relating to the conversion of property remain in force. See Salsman, supra at 168; 1 Anderson's Uniform Commercial Code § 3-419.3, at 688 (1961).

The common law rule, sifted from both case precedent and the respected treatises in the field, suggests that if a bank receives a deposit with instructions to place it to the credit of a fiduciary in this representative capacity, and instead credits it to the individual account of the fiduciary, the bank is liable in conversion if the deposit is later disbursed by the trustee for non-trust purposes. See e.g., Bank of Giles County v. Fidelity & Deposit Co., 84 F.2d 321, 326–27 (4th Cir. 1936); Duckett v. National Mech. Bank, 38 A. 983, 986 (Md. 1897); Restatement of Trusts

(Second) § 324, comment e; Bogert, Trusts & Trustees § 906 (2d ed. 1962).

Ignoring the restrictive indorsement inscribed on the back of a check in the substantial amount of over $84,000.00, the bank proceeded to issue to Mr. Joy in his personal and individual capacity the CD's in the amount of $25,000.00 each. Although the bank officials in no way participated in the extreme breach of trust of which Mr. Joy was guilty, their placing the CD's in Joy's individual name provided the opportunity and encouragement which Joy may have needed to perpetrate his scheme.

██ Plaintiff BNS urges the Court that liability cannot be predicated on the restrictive indorsement theory, because the bank was a holder in due course. BNS ignores, however, the fact that if a Court finds, as I have, that a bank has failed to abide by a restrictive indorsement, that bank is precluded from attaining holder in due course status. Section 3—206 of the Code recognizes that a trust indorsement does not ipso facto give a payor-bank such notice as to deny it the status of a holder in due course. Such payor is, however, immunized from liability by 3—206(2) only insofar as its payment to the trustee or to a purchaser from the trustee is "consistent with the terms" of the trust indorsement. See 11A V.I.C. § 3—206, comment 6. Such is not the case here, and BNS is not a holder in due course.

### III

#### LIABILITY OF CITIBANK

#### (1)

Plaintiff's claim against Citibank sounding in the trustee ex maleficio theory must fail for essentially the same reasons that that claim as to BNS failed. The record is devoid of any showing that anyone at Citibank had

knowledge of the illegality of the $115,211.00 deposit. See Restatement of Trusts (Second) § 324. Again, there is no evidence from which the Court might find knowledge on the part of the bank employees of the provisions of the Bankruptcy Act relating to designated depositories and the rightful deposit of bankruptcy funds.

### (2)

 I now turn to the question of whether Citibank is liable for issuing the CD contrary to instructions. The face of the check presented to Citibank clearly indicated that not only was Joy paid in his representative capacity, but further specified the identity of his principal, Quantum Development Corporation. The indorsement on the back of the check read, "Charles Joy Receiver Quantum Corp.". On the application for the CD was inserted on the line designated "Favor of" the words "Charles R. Joy, Receiver". But despite these three seemingly unequivocal indications that Joy was requesting the CD as a fiduciary of Quantum, the CD was ultimately issued to him in his individual name. Mr. Cavanaugh failed to detect this discrepancy at the time he signed the certificate. Although nothing in the record would indicate that the omission of the word "Receiver" was done intentionally, such omission and the failure of Mr. Cavanaugh to perceive it clearly constitutes negligence on the part of the bank's employees. Such lack of due care becomes even more aggravated when viewed in the context of the large amount of the deposit. As in the BNS factual situation, a CD was issued contrary to instructions, thereby enabling the trustee to commit a defalcation of the proceeds of the CD with greater facility.

Plaintiff Citibank in its post-trial memorandum to this Court relies heavily on the Uniform Fiduciaries Act, as enacted by the Virgin Islands in 15 V.I.C. § 1041 et seq., and the Restatement provisions dealing with the liability

108

of a third person for the breach of trust of a fiduciary. See Restatement of Trusts (Second) § 321. Section 321 of the Restatement requires that in order for a third party to be liable for the misapplication of money by a trustee, that third party must have had notice that the trustee was misapplying the money. The Uniform Fiduciaries Act, in 15 V.I.C. § 1044, sets forth an even stricter standard. That provision requires either actual knowledge of a breach of duty on the part of fiduciary or knowledge of such facts that would render taking a negotiable instrument from the fiduciary an act of bad faith.

Had this Court based its imposition of liability on Citibank on an alleged participation in or knowledge of the breach of trust by the bank, these provisions might have worked to relieve the bank of liability. For, I do not believe the facts support either knowledge of Joy's intended breach or bad faith on the part of Citibank or BNS. Liability is rather based on the issuance by Citibank of a CD to Joy personally, in the face of unambiguous instructions, derived from both the endorsement on the $115,211.00 check and the CD application form, to issue the certificate to Joy as a receiver of Quantum. See Restatement of Trusts (Second) § 324, comment e; Bank of Giles County v. Fidelity and Dept. Co., supra; Duckett v. National Mechanics' Bank, supra; 5A Michie, Banks & Banking § 57b, at 172.

### JUDGMENT

In accordance with the foregoing Memorandum Opinion and the reasons set forth therein, it is hereby

ORDERED, ADJUDGED and DECREED:

1. That plaintiff American Fidelity Fire Insurance Company be paid by defendant Bank of Nova Scotia the sum of $77,664.54, plus interest thereon at the rate of 6% per annum from October 2, 1973, to July 1, 1975 (the date

on which the amendment to 11 V.I.C. § 951 becomes effective), and 9% per annum from July 1, 1975, to the date of this Judgment.

2. That plaintiff American Fidelity Fire Insurance Company be paid by defendant First National City Bank the sum of $117,571.51, plus interest thereon at the rate of 6% per annum from November 19, 1973, to July 1, 1975, and 9% per annum from July 1, 1975, to the date of this Judgment.

3. That plaintiff American Fidelity Fire Insurance Company be indemnified by defendants Bank of Nova Scotia and First National City Bank for costs and attorneys' fees incurred by it in this action.

Be it further ORDERED:

That pursuant to the procedures established by the Third Circuit in Lindy Bros. Bldrs., Inc. v. Am. R. & S. San. Corp., 487 F.2d 161 (3d Cir. 1973), and Estien v. Christian, 507 F.2d 61 (3d Cir. 1975), counsel for AFFIC shall set forth in affidavits the number of hours expended in the preparation of this litigation, their normal billing rates, the contingent nature of recovery in this action, the complexity of the issues, etc. Counsel shall pay special attention to the relative allocation of time and effort as between the BNS and Citibank proceedings. If, following the submission to the Court of the foregoing affidavits, the defendants have any objections to the facts as stated therein, they may request either an adversary hearing on the issue of attorneys' fees or submit the issue to the Court on written memoranda. Said objections shall be submitted to the Court within ten (10) days of the filing of the affidavits of plaintiff's counsel.