WESTERN ASSURANCE CO., INC.,
Debtor in Possession, Plaintiff–
Appellant,

v.

STAR FINANCIAL BANK OF INDIA-
NAPOLIS, f/k/a Security Bank,
Defendant–Appellee.

No. 92–2986.

United States Court of Appeals,
Seventh Circuit.

Argued May 4, 1993.

Decided Aug. 31, 1993.

Edward S. Adams (argued), Hall & Adams, Indianapolis, IN, for plaintiff-appellant.

R.C. Richmond, III (argued), Sommer & Barnard, Indianapolis, IN, James W. Wilson, Michael E. Farrer, Bingham, Farrer & Wilson, Elwood, IN, for defendant-appellee.

Before CUDAHY, FLAUM and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Western Assurance Co. (Western) is a California corporation engaged in the business of helping clients recover overpayments of FICA taxes. Its Indiana office was managed by J.D. Connors, one of its vice presidents. Connors Consulting Group (CCG) is an Indiana corporation that also assists clients in recovering overpaid FICA taxes. Since 1982, J.D. Connors has been the sole shareholder of CCG. Although the actual relationship between CCG and Western is somewhat obscure, it is clear that during late 1981 and early 1982, Western's majority stockholder and CEO, Martin Nemeth, was in contact with J.D. Connors about the possibility of Western and CCG working together on a

FICA tax recovery program for the State of Indiana. Nemeth and Connors, working together, eventually obtained contracts with Indiana, as well as with other states, cities and counties. Some of these contracts were obtained in the name of Western, while others were obtained in the name of Mid Western Assurance Co., Inc., a subsidiary of CCG.[1]

On December 10, 1982, Western opened a bank account at Star Financial Bank (Star). The signature card for the account was signed by Nemeth, J.D. Connors and Linda Connors, J.D.'s wife, who worked as a bookkeeper for both Western, at its Indiana office, and for CCG. The three also signed a resolution of Western's board of directors, which included the following language:

> [T]he officer(s) or person(s) or either of them named on the reverse hereof are hereby authorized and directed to endorse for deposit, discount or collection to the credit of the above named account all checks, drafts, notes, acceptances and any other negotiable instruments.

On February 12, 1983, Western opened a second bank account at Star, and the same parties completed another signature card. This card contained the following provisions:

> Each of you (until we receive actual notice of your death, incapacity, or notice in writing to change this account) authorizes each other person signing this form to endorse any item payable to you or your order for deposit to this account or any other transaction with us.

Subsequently, CCG also opened a number of bank accounts at Star. One was opened under the name of CCG itself, for which J.D. and Linda Connors were signatories. Others were opened in the name of two of CCG's subsidiaries—Mid Western Assurance Company and Western Assurance Company of Indiana. Nemeth and the Connors signed a signature card for the Mid Western Assurance Company account, which was identical

in all material terms to the signature card for the second Western account. Western's accounts remained active until 1985, at which time Nemeth instructed Linda Connors to remove all of the money from the accounts. The Connors maintain that Nemeth instructed them to close Western's accounts and deposit checks payable to Western into accounts of CCG. But Nemeth contends that he told the Connors only to close the Western accounts. Both Western and the Connors acknowledge, however, that Star was never notified of Western's desire that its accounts be closed.

In 1986, at his own request, J.D. Connors was removed from his position as vice president of Western. However, on three subsequent occasions—in August 1986, February 1987 and April 1987—Nemeth instructed one of Western's customers, Electronic Data Systems, to send checks payable to Western to J.D. Connors in Indiana. On each occasion, Nemeth called Connors before the check arrived, and instructed him to (1) deposit the checks into a CCG account, (2) keep some of the money and (3) send the remainder back to Nemeth.[2] J.D. and Linda Connors endorsed the checks, deposited the first two into the Western Assurance Company of Indiana account and·deposited the third into the CCG account.

Between September 1987 and June 1988, eight Western customers sent nine more checks payable to Western, totalling $544,-686.52, directly to the Connors at the Indiana office. Either J.D. or Linda Connors endorsed the checks and deposited them into CCG and Western Assurance Company of Indiana accounts. These checks are at issue in this proceeding.

On October 21, 1988, Western filed a complaint in the district court against J.D. Connors, Linda Connors, CCG and Star. Jurisdiction was properly predicated upon a diversity of citizenship. 28 U.S.C. § 1332. On August 13, 1990, the complaint was amended

---

**1.** The parties do not agree on the exact nature of the relationship between Western and CCG. Specifically, they dispute whether Western and CCG were joint venturers as to the FICA recovery contracts.

**2.** It is unclear exactly why this arrangement was necessary. Nemeth stated, rather cryptically, that he "had a problem with [his] bank, and Connors needed money for payroll that was coming due." Deposition of Martin Nemeth at 977–978.

to state a wide array of claims ranging from fraud to conversion. The defendants moved the district court for summary judgment on all but one of the claims. The court granted this motion with respect to the conversion claim against Star. The district court held that Star's conduct, considered in the light of the authorization granted to the Connors both in the corporate resolution and in the signature cards, was commercially reasonable as a matter of law. The court noted that, at the time the checks in question were deposited, the corporate resolution and the signature cards continued to define the legal relationship between Star and Western. The reason for this was that, even though Western's accounts had not been used for some time, Western never notified Star in writing of its intention to close them.

Although final judgment has not been entered on all of Western's claims, the district court did enter partial summary judgment on Count II of Western's Second Amended Complaint, which alleges that Star converted the nine checks when it accepted them for deposit. In a separate order, the district court also found that there was no just reason for delay and entered final judgment in favor of Star pursuant to Fed.R.Civ.P. 54(b). Western appeals, and we, considering the matter de novo, now affirm.

■ Western argues that Star is liable for conversion under Section 3–419 of the Uniform Commercial Code, which Indiana has adopted. I.C. 26–1–3–419. In relevant part, this statute provides that "[a]n instrument is converted when ... it is paid on a forged endorsement." I.C. 26–1–3–419(1)(c). Star asserts that it is absolved from any liability pursuant to I.C. 26–1–3–419(3), which establishes the following defense to a conversion claim:

> Subject to the provisions of this act concerning restrictive endorsements, a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instru-

ment or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

Specifically, Star maintains that it acted in good faith and in observance of reasonable commercial standards because it handled the checks in accordance with Western's corporate resolution and the applicable signature cards.[3] Star also contends that the Connors had apparent authority to endorse and deposit the checks as they did and that its reliance on this authority was commercially reasonable. Western rejoins that Star's behavior was not commercially reasonable and that, even if it were, Star is still liable for those checks it improperly paid over a restrictive endorsement. We will address each of these arguments in turn.

■ A bank's signature card is a contract between the bank and its depositors. H. Bailey & R. Hagedorn, *Brady on Bank Checks,* para. 11.6, at 11–10 (7th ed. 1992). Whether a bank acts in good faith and according to commercially reasonable standards when it deals with an instrument in accordance with the terms of such a contract appears to be a question not authoritatively settled in Indiana. Common sense would indicate that following the terms of a signature card would meet a good faith and commercial reasonableness test. Support for this view can be found in an Indiana Court of Appeals decision, *Boyer v. First Nat'l Bank of Kokomo,* 476 N.E.2d 895 (Ind.App. 4 Dist. 1985).

In *Boyer,* a bank cashed a check payable to two co-venturers even though it was endorsed only by one. Under Indiana law, co-venturers are, as to third parties, agents of one another for all acts within the scope of their enterprise, including the negotiation of checks. *Id.* at 900. The court concluded that since the checks were endorsed "by an *authorized* person, the bank acted in accordance with reasonable commercial standards in cashing them despite [a] missing endorsement." *Id.* at 901 (emphasis supplied). The

---

**3.** Star was the first bank to which the nine checks were transferred for collection and, therefore, is a "depositary bank" within the meaning of the Uniform Commercial Code. *See* I.C. 26–1–4–105(a).

court reached this result even though the bank was without actual knowledge that the person who endorsed the checks was authorized to do so. *Id.* at 900–901.

Thus, according to *Boyer*, the question before us is simply whether the Connors were "authorized" to endorse the nine checks payable to Western. Star's primary evidence of authorization comes from the corporate resolution and the signature cards that Nemeth signed in opening the Western accounts. Although the corporate resolution may not provide the requisite authorization, the signature cards certainly do.[4] The signature card that both the Connors and Nemeth, on behalf of Western, executed clearly provides that it "authorizes each other person signing this form to endorse any item payable ... to this account or any other transaction with [Star]." Thus, the signature cards' unambiguous language clearly authorized the Connors to deposit the Western checks, even into CCG accounts.[5]

It is of no consequence that Star likely did not consult the signature cards when the Connors presented the checks for deposit. According to *Boyer*, a bank acts in a commercially reasonable manner whenever it negotiates a check endorsed by an authorized person. Star may have, to use *Boyer's* language, "lucked out" when it deposited checks into dormant accounts. *Id.* at 901. Nonetheless, this good fortune does not alter our conclusion that, under Indiana law, Star dealt with these checks in good faith and in observance of reasonable commercial standards.[6]

■ Western argues, however, that the accounts to which the signature card pertained were "closed" and that it had terminated its banking relationship with Star, as well as the Connors' authority to endorse checks on its behalf, before the Connors deposited the checks in question. But the card's clear and unambiguous language again refutes Western's contention. The Connors' authority to endorse checks for Western existed, according to the signature card itself, until Star received *"notice in writing* to change this account." (emphasis supplied). As the district court noted, and as Western has conceded, Star was never given written notice that the accounts were to be closed. Thus, the authority granted by the signature card was in full force when the Connors deposited the checks at issue.[7]

**4.** Western points out that the corporate resolution only provided authorization for the "above named account," which was a Western account. It appears, therefore, that Star did not act in accordance with the corporate resolution when it allowed the Connors to deposit checks made out to Western into the accounts of CCG and its subsidiary.

**5.** Nemeth signed, on behalf of Western, three signature cards. Although none of them pertained to the accounts into which the nine checks were deposited, each of them authorized the Connors to endorse checks "for deposit to this account *or* any other transaction with [Star]." As a result, the Connors were apparently authorized to endorse checks payable to Western for deposit into any Star account that they chose.

**6.** Western contends that *Boyer* governs this case only if Western and CCG were engaged in a joint venture. Since that issue cannot be resolved on summary judgment, Western contends that *Boyer* cannot be a basis for our decision. We find this argument unavailing. The joint venture agreement in *Boyer* simply provided the authorization for the parties to endorse the checks. Here that authority is provided by the signature cards. We do not read *Boyer* to apply only to cases involving joint ventures.

**7.** As noted earlier, Star also asserts that Western had cloaked the Connors with "apparent authority" to deposit the nine checks. It bases this argument, in large part, on the fact that Nemeth had previously authorized the Connors to deposit the three Electronic Data Systems (EDS) checks into the CCG account. Apparent authority is that authority which a third person reasonably believes the agent to possess because of some manifestation from his principal. *Herald Telephone v. Fatouros,* 431 N.E.2d 171, 175 (Ind.Ct. App.1982). Whether agents, such as the Connors, have apparent authority to perform a particular act on their principal's behalf calls for a fact-intensive inquiry. *See John Hancock Mutual Life Ins. Co. v. Mann,* 86 F.2d 783, 786 (7th Cir.1936). After reviewing the evidence, as we must, in the light most favorable to Western, *see Adickes v. S.H. Kress Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), we conclude that there exists a genuine issue of material fact regarding this issue and, therefore, that it is not a proper basis for summary disposition. Specifically, we cannot conclude from the record whether the Connors' actual authority to endorse the three EDS checks was an adequate manifestation of apparent authority to endorse the nine checks at issue here. But since the signature cards clearly authorized the Connors to endorse the nine checks, the scope of the Connors' appar-

We note that this is not a case where a bank simply "took the Connors' word" that they were authorized to sign for Western. As a result, Western's reliance on *Clark v. Griffin*, 481 N.E.2d 170 (Ind.App. 1 Dist. 1985) is misplaced. In *Clark*, the court concluded that a bank acted in a commercially unreasonable manner when it allowed a company's employee to deposit company checks into his personal account. *Id.* In such a situation, the court held, reasonable banking standards precluded the bank from merely relying upon the employee's word that he was authorized to endorse the checks. Instead, the bank had to *inquire* whether such authority in fact existed. *Id.* Here, however, Star had more than the Connors' assurances; it had the signature cards. In addition, although not as clear a point, *Clark* may apply only to those situations in which an employee presents a check for deposit into his or her own *personal* account. Under those circumstances, *Clark* instructs, a bank must make proper inquiry into the depositor's authority to endorse the checks. But that is not this case. The Connors did not deposit the checks directly into their personal accounts. Instead, they deposited them into accounts owned by CCG or one of its subsidiaries, companies closely linked to Western.

 Finally, Western argues that, even if Star has established that it acted according to reasonable commercial standards, it remains liable on those checks paid over a restrictive endorsement. Western asserts that Section 3–419(4) creates, by negative implication, a cause of action for conversion against a depositary bank that does not comply with the terms of a restrictive endorsement, regardless of whether the bank acted in good faith and according to reasonable commercial standards. *See, e.g., In Re Quantum Development Corporation*, 397 F.Supp. 329 (D.V.I.1975), *aff'd*, 534 F.2d 532 (3d Cir.1976). Although Western has not cited any Indiana cases for this proposition, we will assume that the Indiana Supreme Court would credit such a principle.

Section 3–419(4) provides: "An intermediary bank or payor bank which is not a depos-

itary bank is not liable in conversion solely by reason of the fact that proceeds of an item endorsed restrictively ... are not paid or applied consistently with the restrictive endorsement of an endorser other than its immediate transferor." I.C. 26–1–3–419(4). Section 3–205, in turn defines a restrictive endorsement: "An [e]ndorsement is restrictive which either ... includes the words 'for collection,' 'for deposit,' 'pay any bank,' or like terms signifying a purpose of deposit or collection." I.C. 26–1–3–205. A number of the checks at issue here were endorsed "for deposit only," and, thus, prevented anyone from negotiating the checks other than for deposit. The endorsements, however, did not by their terms require deposit into one of Western's accounts. As a result, when Star deposited the checks into certain CCG accounts, it did not run afoul of the restrictive, "for deposit only," endorsement.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ent authority, if any, is not dispositive of West-   ern's conversion claim.