# C. S. BOWEN COMPANY, INC. T/O/U AND T/U/O HARTFORD ACCIDENT & INDEMNITY COMPANY ET AL. v. MARYLAND NATIONAL BANK

[No. 449, September Term, 1976.]

*Decided May 12, 1977.*

The cause was argued before DAVIDSON, MELVIN and MASON, JJ.

*Michael L. Schwartz* with whom were *David K. Ebersole* and *Richard Bloch* on the brief, for appellants.

*Gordon C. Murray* and *Leonard A. Orman,* with whom was *L. Keith Simmer* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

In this case the appellant (plaintiff below), C. S. Bowen Co., Inc. (Bowen), claims that the appellee (defendant below), Maryland National Bank (Maryland National), is liable to it for negligence and conversion. More specifically, Bowen claims that Maryland National wrongfully credited to the checking account of "Mrs. Patricia M. Andrews and Charles S. Bowen" at Maryland National checks belonging to Bowen and has failed to reimburse it for the full amount of those checks. It is claimed that Mrs. Andrews, Bowen's employee, stole the checks from Bowen and that Maryland National accepted them for deposit in spite of a restrictive endorsement on all of them reading "For Deposit only, C. S. Bowen Company". After a jury verdict in favor of Maryland National in the Superior Court of Baltimore City (Ross, J., presiding) and a judgment entered thereon, Bowen appeals, presenting us with three questions for decision: [1]

(1) Did the trial court err in not granting Bowen's motion for a directed verdict "on the issue of Maryland National's liability"?

(2) Did the trial court err "in failing to instruct the jury that if they found the checks deposited by Andrews in the Andrews account at Maryland National were stamped 'For Deposit Only, C. S. Bowen Company', they would have to find Maryland National liable"?

(3) Did the trial court err "in admitting irrelevant

---

[1]. Hartford Accident & Indemnity Co., Bowen's bonding company, is a use-plaintiff in the case whose interest is to recover $25,000 (the limit of its fidelity bond) paid to Bowen for its alleged losses resulting from Mrs. Andrews' alleged dishonesty.

and prejudicial activities of the president of C. S. Bowen"?

## The Evidence

Bowen is described in the testimony as a "small" Maryland corporation [2] located in Baltimore City engaged in the business of selling and servicing paint spray equipment and sandblasting equipment. Mrs. Andrews was hired by Bowen in October 1965 as a bookkeeper. Her duties were "to pick up the mail, to make deposits, keep the books and do some filing, those type of things". According to Bowen's president (Mr. Whitaker), with reference to deposits, "If a check came in the mail she was supposed to take it out, stamp it with 'Deposit only to C. S. Bowen' and then she would post it to the ledger card to whatever account it was to show that the invoice had been paid and then, of course, that posting was posted into the cash receivable ledger and the check was put on a deposit slip and taken to" the Union Trust Company for deposit in Bowen's checking account at that bank. Bowen had no account at Maryland National.

---

2. Typical of a large portion of the evidence in this case, there is considerable confusion concerning the appellant's precise corporate name. In its original pleadings, the name is "C. S. Bowen and Company, Inc." At trial, Mr. John E. Whitaker, the president and sole owner of the corporation, testified on cross-examination:

"Q. . . . What is the corporate name of C. S. Bowen? A. C. S. Bowen and Company, Inc.

Q. C. S. Bowen Inc? A. If that's the way you want it, I-N-C.

Q. Well, what is it, I-N-C? A. C. S. Bowen, capital C-o, for company, Inc.

Q. And that is the way it is set up with the Department of Assessments and Taxation? A. That's the way it is set up on the invoices there [The invoices referred to carry the name as "C. S. Bowen, Co. Incorporated".].

Q. And that's the way it has always been set up? A. Yes, sir."

At the end of the case, following the court's instructions to the jury and before final arguments, appellant's counsel moved, out of the presence of the jury, to amend the name in the pleadings to "C. S. Bowen Co., Inc.", although he said he was "not positive of the exact corporate name". The motion was granted and the Clerk was instructed to "note the change where necessary".

On 20 March 1967, Mrs. Andrews, without the knowledge or authority of Bowen, went to a branch bank of Maryland National in Baltimore City and opened a "regular" joint checking account in the names of "Mrs. Patricia M. Andrews and Mr. Charles S. Bowen". She signed her name to a signature card and was asked to have Mr. Charles S. Bowen do the same. As "Charles S. Bowen" did not exist, Mrs. Andrews could not comply with this request. Instead, she took the card out of the bank, wrote the name "C. S. Bowen" on the card and returned it to the bank. Mrs. Andrews' bank statements and deposit slips, introduced in evidence, showed that thereafter, between March 1967 and September 1968 Mrs. Andrews periodically deposited in the "joint" account checks totalling in the aggregate approximately $80,000.00, and that she drew on the account for her personal wants and needs.

Bowen claims that all the checks deposited by Mrs. Andrews were checks she had stolen from it, and that Maryland National is liable to it for their face amounts because, according to Bowen, *all* the checks were restrictively endorsed with a rubber stamp reading *"For Deposit Only, C. S. Bowen Company"*.

Maryland National does not contest the fact that Mrs. Andrews stole checks from Bowen or that some of the stolen checks may have been accepted by it for deposit in her "joint" account. Maryland National does, however, vigorously contend that Bowen has failed to meet its burden of showing which checks deposited by Mrs. Andrews belonged to Bowen or how they were each endorsed. Maryland National further claims that the evidence is such that the jury could have reasonably believed that Mrs. Andrews had repaid to Bowen the amounts of whatever checks she had stolen from Bowen and therefore that, in any event, no damages have been proven.

As its principal witness, Bowen called Mrs. Andrews to testify. She admitted that she had stolen checks from her employer and deposited them in her "joint" account. Her scheme for covering up her peculations was daring, if not ingenious. When a Bowen customer was billed, one of

Andrews' duties was to receive a "green copy" of a numbered five-piece invoice. She was supposed to post the amount shown by the invoice on the customer's individual ledger card and place the green copy, in numerical sequence, in a loose-leaf monthly notebook. Two copies of the invoice were sent to the customer when he was billed for his purchase; another copy was used for "back orders" when necessary, and the fifth, or "gold copy", was placed in a "customer file" to facilitate filling a customer's re-order of the same item. The "green copy" was the "control copy".

Mrs. Andrews said that her scheme was, from time to time, to hide the green copy of the invoice and not post the amount due on the customer's ledger card or anywhere else among Bowen's records. Thus, when Bowen's accountant made his customary monthly examination of the company's books, he would find no record of the customer's order (which was kept with the "gold copy" and not ordinarily checked by the accountant, or anyone else unless there was a re-order) and no record of an account receivable from that customer. Mrs. Andrews, however, in furtherance of her scheme, kept a notation of her own of the "green copy" of the invoice she had hidden, listing the customer's name and the amount he had been billed. Then, when the customer's check arrived in the mail, instead of depositing the check in Bowen's account at the Union Trust Company, she deposited it in her "joint" account with the fictitious "Charles S. Bowen" at Maryland National. She said she repaid Bowen for some of the checks but she did not know how much was "involved" and had "no idea" how much she owed Bowen. She said her method of repayment was to "go to the bank and purchase money orders and put them back in, but I don't know how much".

In September 1968, Mr. Whitaker discovered Mrs. Andrews' dishonesty while she was on vacation. By letter dated 19 September, Bowen's attorney notified Mr. John O. Montgomery, Maryland National's security officer, that Mrs. Andrews "has apparently misappropriated funds of the Corporation by employing the use of an account in the Maryland National Bank" and "that under no circumstances

should any of the funds which you presently have on hand be released to anyone without authority of Mr. Whitaker". Mr. Montgomery received the letter 20 September and on the same date ordered that the account be "frozen to prevent any further payment from the account". At that time the balance in the account was $4,353.06. Despite the "freeze" order, however, Maryland National continued to honor some checks drawn on the account that were outstanding at the time the "freeze" order was given.

On 21 September, Mr. Montgomery interviewed Mrs. Andrews. She gave him a list of seven checks she said she had deposited in her "joint" account. This list (Defendant's Exhibit No. 1) contained only the amount of each check with the payor's name noted after six of the amounts. The payor of one of the checks, in the amount of $3,909.08, was Bethlehem Steel Corporation. The evidence is uncontroverted that the named payee of this check was "C. S. Bowen Company, Inc.", that its only endorsement was by a rubber stamp reading, "For Deposit Only, C. S. Bowen Company", and that it was accepted for deposit by Maryland National to the credit of Mrs. Andrews' joint account on 18 September 1968. It is also uncontroverted that on 19 November 1968, Maryland National repaid to Bowen the amount of the check because, according to Mr. Montgomery, Mrs. Andrews had told him at his 21 September interview with her that "This was money that belonged to C. S. Bowen and Company". It is clear that this check is not one of the checks for which Bowen seeks damages in conversion or negligence.

With respect to the payees of the checks she "took from C. S. Bowen", Mrs. Andrews said "some were made out to C. S. Bowen Company, some were made out to Patricia Andrews". At another point in her testimony she said, "They were all made out to C. S. Bowen".

Regarding the endorsements, Mrs. Andrews testified she used a rubber stamp that belonged to Bowen on all the checks she stole. According to her, the rubber stamp read,

" 'For Deposit Only, C. S. Bowen Company, Inc.' " or just " 'C. S. Bowen' ".

In a pre-trial deposition, Maryland National's security officer, Mr. John O. Montgomery, testified that Mrs. Andrews told him that "some of the checks she had put in her account belonged to the company, and some of them didn't". At trial, Mrs. Andrews testified that, except for "several" of her pay checks legitimately received from Bowen, all of the checks she deposited were checks belonging to Bowen. Her cancelled pay checks, however, for the period covering the life of the "joint" account do not show that she deposited any of them at Maryland National. Thus, there is some evidence that Bowen was indeed the owner of all the checks deposited by Mrs. Andrews.

I

At the close of all the evidence, Bowen, the plaintiff below, moved for a directed verdict. The motion was denied. On appeal, Bowen argues that the trial court erred in not granting the motion "on the issue of Maryland National's liability" and asks that we remand the case for a new trial on the issue of damages only. We first consider whether this precise issue is properly before us. It is properly before us only if it was properly presented to the trial court and decided by it in the first instance. Md. Rule 1085.

Maryland Rule 552 a provides that in a jury case,

". . . . any party may move . . . at the close of the evidence, for a directed verdict in his favor *on any or all of the issues.* Such motion shall state the grounds therefor . . . . " (Emphasis added.)

The motion in this case was general in nature and was not limited to any one issue. Rather it seems to have been directed to "all of the issues" considered by Bowen to be necessary to render Maryland National liable to it for the aggregate amount of all checks deposited by Mrs. Andrews in her "joint" account. The facts, claimed by Bowen to be established by the evidence, were that 1) *all* the checks

deposited by Mrs. Andrews in her "joint" account were "C. S. Bowen Company checks"; and 2) *all* the checks were restrictively endorsed with a rubber stamp, "For Deposit Only, C. S. Bowen Company", and were improperly applied by Maryland National to the "joint" account. Bowen argued that, having established those facts, there was "[no] issue to be submitted to the jury". Although Bowen's counsel also argued that "[t]here is just nothing for the jury to determine with reference to the *liability* of the bank", we find nothing in the stated grounds for the general motion for a directed verdict indicating that the motion was limited to the issue of liability alone, leaving the issue of damages to be determined by the jury. Here, there was no concession that there was *any* issue left for determination by the fact finder. On appeal, however, Bowen seems to concede that the matter of damages is one properly for the jury and asks that we remand the case for a new trial on that issue alone. But, as we have indicated, whether that issue alone should have been submitted to the jury is not a question that was either presented to or decided by the lower court. The question is therefore not properly before us in this appeal. Md. Rule 1085.

Moreover, even if the question were properly before us as having been presented to and decided by the trial judge, we would hold that the motion was properly denied. This is so because the evidence claimed by Bowen to establish Maryland National's liability, *vel non*, as to *all* the checks deposited by Mrs. Andrews is not uncontroverted. Bowen argued to the trial court that it is the true owner of "each and every" check deposited by Mrs. Andrews. We need go no further than to point out that this argued "fact" is not uncontroverted. Although the evidence may support such a factual finding, it does not compel it.

While it is well settled that under Rule 552 a, a trial court may grant a directed verdict to a plaintiff as well as a defendant "on any or all of the issues", where the court is considering whether to grant such a motion to a plaintiff on any issue as to which he has the burden of proof, the motion should be denied unless the facts are *uncontroverted* (as

opposed to merely *uncontradicted)* or the parties have agreed as to the facts and such facts and the circumstances surrounding them permit of only one inference with regard to any issue presented by the motion. *See, Alexander v. Tingle,* 181 Md. 464, 30 A. 2d 737 and *Pennsylvania R. Co. v. Stallings,* 165 Md. 615, 170 A. 163. In the latter case, at 619, the Court said:

> " . . . . Nor it is true that the court can say as a matter of law that one upon whom the burden rests has discharged that burden merely because testimony offered by him was not contradicted. To so hold would be to override the decisions in a long line of cases that the jury has the right to disbelieve a witness even when uncontradicted. [citing cases] In *Harrison v. Central Construction Co.,* 135 Md. 170, at page 180, 108 A. 874, 878, it was said: 'When the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court'.
>
> "This was said in a case where there was an agreed statement of facts. And it will be found, on examination of all the cases where like language is used there was no controversy about the facts. [citations omitted]. 'Undisputed', as used in these cases, must be taken to mean "uncontested', rather than 'uncontradicted'."

## II

Bowen excepted to the court's instructions as follows:

> " . . . . I requested an instruction, that Your Honor, instruct the jury that if the jury finds that the checks, *For Deposit Only, C. S. Bowen,* then the jury would have to find the bank was negligent. Therefore, the jury would have to find the bank could not necessarily defend under preclusion

section or under the other section that Your Honor read to them." (Emphasis added)

On appeal Bowen contends that,

"the court below erred in its instructions to the jury which failed to instruct the jury that if they found the checks deposited by Andrews in the Andrews account at Maryland National were stamped *'For Deposit Only, C. S. Bowen Company'* they would have to find Maryland National liable". (Emphasis added)

Here again, we find a material difference between the issue actually submitted to the trial court and the issue which we are asked to decide on appeal. Md. Rule 554 e provides that,

"Upon appeal a party assigning error in the instructions, shall be restricted to (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the grounds of objection distinctly stated at the time, and no other errors or assignments of error in the instructions shall be considered by the appellate court."

As the "particular failure to instruct" now argued on appeal was not "distinctly objected to" in the trial below, we are not permitted to consider it.

Moreover, we note that Bowen in its brief to us, after stating the contention, goes on to say that "C. S. Bowen does not contend that the lower court failed to properly recite the language of the pertinent statutory sections [of the Uniform Commercial Code], but complains that the mere citing of the language was too confusing for the jury to understand". As no such "complaint" was made to the trial court, it cannot be considered here. Rule 554 e.

The reason why we think there is a material difference

between the exception actually taken to the trial court's failure to instruct and that which is argued on appeal is this:

The Uniform Commercial Code requires that a depositary bank that is the transferee of a restrictively indorsed instrument "must pay or apply any value given by [it] for or on the security of the instrument consistently with the indorsement". Md. Uniform Commercial Code, § 3-206 (3). This section and other sections of the U.C.C. dealing with restrictive indorsements make it clear that a depositary bank that does not apply an instrument consistently with a restrictive indorsement is liable in conversion. *Salsman v. National Community Bank of Rutherford*, 246 A. 2d 162 (N.J. 1968); *In Re Quantum Development Corp.*, 397 F. Supp. 329 (D.V.I.), aff'd on other grounds, 534 F. 2d 532 (3rd Cir. 1976).

In the case at bar, it will be recalled that one of the joint owners of the account was, so far as Maryland National knew, "Charles S. Bowen", whose signature card bore the name "C. S. Bowen".[3] Therefore, with respect to any such checks, (*i.e.*, with an indorsement reading "For Deposit Only, C. S. Bowen") it is at least a jury question whether Maryland National applied the value thereof consistently with the indorsement "For Deposit Only, C. S. Bowen". If it did, then it is not subject to what Bowen contends to be the absolute liability imposed upon a depositary bank that fails to honor a restrictive indorsement. Thus, in the unusual circumstances of this case, the trial court was correct in not granting the particular instruction requested.

We observe that even if Maryland National could be said to have applied the proceeds of a particular check "consistently with the indorsement", it might still be liable in conversion to Bowen. As the trial court correctly instructed the jury, "Except as provided in the Uniform Commercial Code, a bank which takes checks from a person, who is not the true owner of those checks, and who has no authority [from the true owner] to transfer or negotiate the

---

3. A later signature card was furnished on 11 May 1967 on which Mrs. Andrews had printed the signature "Charles S. Bowen".

checks, is liable to the true owner of the checks for the conversion". *See, National Union Bank v. Rubber Co.*, 148 Md. 449, 129 A. 688 (1925), a pre-U.C.C. case in which the basic pre-U.C.C. rule was stated thusly:

> "If a negotiable instrument having a forged indorsement come to the hands of a bank and is collected by it, the proceeds are held for the rightful owners of the paper, and may be recovered by them, although the bank gave value for the paper, or has paid over the proceeds to the party depositing the instrument for collection."

Section 3-419 (3)[4] of the Maryland Uniform Commercial Code (Md. Code, Commercial Law Volume, §§ 1-101 through 10-104, effective 1 February 1964), described in the Official Comments as "new", would appear to provide a depositary or collecting bank a complete defense at the suit of a true owner for conversion or negligence if the defendant bank can show 1) that it has in good faith and in accordance with reasonable commercial standards dealt with the instrument alleged to have been converted or negligently handled, *and* 2) that it has no proceeds of the instrument remaining in its hands at the time suit is filed. Whether this section is indeed available to a collecting-depositary bank to limit its liability for conversion at the suit of a true owner has never been decided in this State and the issue is not before us for decision now. We mention it only because, upon remand, it is an issue that may require resolution by the trial court.[5]

---

4. Section 3-419 (3) reads: "Subject to the provisions of Titles 1 through 10 of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."

5. *See,* Cooper v. Union Bank, 507 P. 2d 609 (Calif., 1973), where the California Supreme Court adopted an interpretation of "proceeds" which effectively eliminated the availability of the defense. For criticism of this holding, see Comment, *Depositary Bank Liability Under § 3-419 (3) of the Uniform Commercial Code,* 31 WASHINGTON AND LEE LAW REVIEW 676; Recent Developments, *Section 3-419 (3) of the U.C.C. Does Not Limit*

We further observe that any defense afforded by § 3-419 (3) would not be available to a depositary or collecting bank that applies the proceeds of a check inconsistently with a restrictive indorsement. This is so because of the express language of the section rendering its entire content "subject to" all provisions of the U.C.C. concerning restrictive indorsements, including § 3-206 (3).[6]

## III.

During the cross-examination of Bowen's president, John Whitaker, counsel for Maryland National sought to explore the non-corporate use by Whitaker of corporate funds. A timely objection was interposed, and a bench conference followed:

> "(The Court) May I see counsel, please.
>
> * * *
>
> (The Court) What's this all about?
>
> (Mr. Orman [Maryland National's Counsel]) Your honor, I am going to proffer, because I think that Mrs. Andrews — I talked to Mrs. Andrews and got a statement from her and she advised me that in addition to her duties as set out by Mr. Whitaker, that Mr. Whitaker also had her do various other matters on company time and with company money, including payment of rent for his girlfriend's apartment, taking them to dinner and doing various other items, buying them furniture,

---

the Liability of a Depositary Bank to the True Owner of a Check Paid on a Forged Indorsement. 74 COLUMBIA LAW REVIEW 104. See also, Taylor v. Equitable Trust Co., 269 Md. 149, where the Court of Appeals, at 155, in a case not involving the precise issue, quoted with apparent approval from a Comment in 2 Bender's U.C.C. Service, Hart and Willier, § 12.35, at 12-129 (1972): " . . . . Section 3-419 (3) limits recovery against collecting banks for conversion only if they acted in good faith and followed 'reasonable commercial standards' ".

6. As to whether there are any other defenses available to a depositary or collecting bank shown to have applied the proceeds of a check inconsistently with a restrictive indorsement, we need not decide in this appeal. It would seem doubtful that, short of payment to the true owner, there are any such defenses. See, 2 Anderson, Uniform Commercial Code, §§ 3-206.6, 3-404.4, 3-404.9, and 3-406.5; Taylor v. Equitable Trust Co., 269 Md. 149 at 158; Salsman v. National Community Bank, 246 A. 2d 162 (Pa.), aff'd, 251 A. 2d 460.

charging all that to the corporation, as corporate expenditures.

(The Court) What does that have to do with this case?

(Mr. Orman) I believe it has to do with, first of all, the atmosphere he set up in the company and the use of the money for noncorporate events and that he said that all the money that was in the corporation was used only for corporate purposes and that the duties of Mrs. Andrews included just the duties he said.

Now, she had these other duties which were actually noncorporate in nature but were for his own personal use as part of her duties. I believe I can use this to impeach the witness' credibility.

(The Court) *It's all collateral.*

(Mr. Orman) *It may be collateral.*

(The Court) Well, if it is collateral, that answers it.

\* \* \*

(The Court) Well, what bearing does that have on this case, *other than to prejudice the jury* on matters that are collateral to any of the issues before the Court?

(Mr. Orman) Well, I think, Your Honor, it is not collateral, as I said before. He has set up himself a fraudulent atmosphere of writing off noncorporate obligations or noncorporate bills with corporate money. He has set up the use of corporate moneys to allegedly rent apartments and purchase furniture for his girlfriends, all of which were done by Mrs. Andrews at his request.

(The Court) And the theory is that that gave her apparent authority to take whatever she wanted for her own use?

\* \* \*

(The Court) That's what I say. You haven't indicated anything to me, *other than an attempt on the part of the Defendant to introduce evidence purely to prejudice the jury in an attempt to present [ir]relevant evidence.* This jury is already getting restless.

(Mr. Orman) Your Honor, I would proffer that we have testimony to show that Mr. Whitaker, on his own, played with the corporate funds and took cash out of the corporation, ostensibly to pay corporate bills but, in fact, the payment of these moneys were used to put cash in his own pocket which would be nontaxable income.

We should be able to ask Mr. Whitaker about this and I would proffer also that we have evidence that **Mr. Whitaker used corporation funds for noncorporate uses and paid the noncorporate bills with corporate funds through Mrs. Andrews,** who prepared the checks and that he had Mrs. Andrews, on corporation time and with corporation money, squire around certain of his lady friends and pay for their apartments, furniture and other related expenses and I feel, Your Honor, that since we are in the — well, I am just repeating myself, but since we are looking at credibility and since we are looking at contributory negligence under the Uniform Commercial Code, it seems to me, if he testified in regard to everything that Mrs. Andrews did or was to do or what her obligations or duties were, all of this would be admissible.

(The Court) The ruling remains the same." (Emphasis added)

On cross-examination, despite repeated objections and a motion to strike, Mrs. Andrews was allowed to testify to precisely these matters, despite the exclusion by the trial court of similar testimony by Mr. Whitaker. This testimony provided a basis for Maryland National's closing argument to the jury, in which it was repeatedly argued that Whitaker

"created a dishonest atmosphere", avoided payment of taxes and misused corporate funds, and that this "dishonest atmosphere" enabled Mrs. Andrews to steal the checks. Based upon our review of the testimony and the applicable law, we conclude that this testimony was irrelevant, erroneously admitted, and prejudiced the appellant.

Maryland National in its brief does not directly argue the relevancy of the challenged testimony, stating only that the "dishonest atmosphere" allegedly created "by the manner in which the corporate funds were spent for non-corporate activities . . . involving Andrews in tax avoiding schemes — his [Mr. Whitaker's] absences from the office and lack of sobriety when in office" precluded Bowen from any recovery because of the provisions of § 3-404 and § 3-406 of the U.C.C.[7] Suffice it to say that we are not persuaded by the statement. It was error to admit the challenged testimony and in light of the lengthy cross-examination on these irrelevant matters, the extent to which they were emphasized to the jury in closing argument, and the initial recognition by the trial judge of the prejudicial nature of the testimony, the error was not harmless. We must therefore reverse the judgment and remand the case for a new trial. *Blondes v. Hayes*, 29 Md. App. 663, 350 A. 2d 163 (1976).

> *Judgment reversed.*
> *Case remanded for new trial.*
> *Costs to be paid by appellee.*

---

7. "§ 3-404. Unauthorized signatures.

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

(2) Any unauthorized signature may be ratified for all purposes of this title. Such ratification does not of itself affect any rights of the person ratifying against the actual signer."

"§ 3-406. Negligence contributing to alteration or unauthorized signature.

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."