659 A.2d 313

**CITIZENS BANK OF MARYLAND**

v.

**MARYLAND INDUSTRIAL FINISHING CO., INC.**

**No. 103, Sept. Term, 1994.**

Court of Appeals of Maryland.

June 8, 1995.

---

Steven J. Parrott (Nancy E. Leibowitz, Hartman and Parrott, all on brief), Annapolis, for petitioner.

William O. Lockwood, Greenbelt, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (retired) Specially Assigned.

MURPHY, Chief Judge.

In this case we must decide whether, for the purposes of a conversion action under Maryland Code (1975, 1992 Repl.Vol.), § 3–419 of the Commercial Law Article,[1] an agent's indorsements on checks payable to the agent's principal were unauthorized (1) when the agent indorsed the checks with an improper motive or later misappropriated the checks, or (2) when the agent omitted restrictive language required by the principal to be part of the indorsement.

## I.

Section 3–419(1) provides: "An instrument is converted when ... [i]t is paid on a forged indorsement." Official comment 3 explains that this "adopts the prevailing view of decisions holding that payment on a forged indorsement is not an acceptance, but that even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion."[2]  *See Mid–Atl. Tennis Cts. v. Citizens Bank &*

---

1. Unless otherwise indicated, all statutory references are to Maryland Code (1975, 1992 Repl.Vol.), Commercial Law Article.

2. The pre-UCC rule in Maryland was reflected in *Nat. Union Bank v. Rubber Co.*, 148 Md. 449, 129 A. 688 (1925), in which the Court stated:

*Trust Co.*, 658 F.Supp. 140, 143 (D.Md.1987) ("It is axiomatic that an item is converted when it is paid on a forged [i]ndorsement, because the payment is made to one who has no good title."). Section 3–419(1), therefore, "imposes strict liability where a party pays an instrument over a forged indorsement." *Menichini v. Grant*, 995 F.2d 1224, 1232 (3rd Cir.1993). *See also Equitable Life Assur. Soc. of U.S. v. Okey*, 812 F.2d 906, 910 (4th Cir.1987) (stating that § 3–419 imposes "absolute liability"). The exposure created by this strict or absolute liability is somewhat mitigated by § 3–419(3), which limits the liability of a bank to the proceeds that remain in the bank's hands, if the bank establishes (1) that it acted in good faith and (2) that it acted "in accordance with the reasonable commercial standards applicable to the business." [3]

## II.

Pauline Pagani was an employee of Maryland Industrial Finishing Company, Inc. (MIFCO) from April 13, 1989 through February 23, 1990. In June of 1989, Pagani began

"[A]s it is a general rule that no title could be obtained through a forgery, any person getting possession of [a bill] by a forged endorsement, will not acquire any interest in it, although he was not aware of the forgery. * * * It is clear, then, that nothing passed to the defendants by virtue of the forged endorsement. The plaintiff's right to the check remained precisely as it was before his name was forged. The check, therefore, when the defendants obtained the money on it, was the property of the plaintiff, and in that case he may, as we have seen, recover the amount in this action, as money received by the defendants to his use. * * * The defendants' case is not helped by the fact that the forged indorsement was made or contrived by the plaintiff's agent."
*Id.* at 456–57, 129 A. 688 (quoting *Buckley v. Second National Bank of Jersey City*, 35 N.J.L. 400, 402 (1872)).

3. Section 3–419(3) states in full:
"Subject to the provisions of Titles 1 through 10 of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."

embezzling funds by depositing some of MIFCO's checks into her own account at Citizens Bank of Maryland (Citizens), rather than depositing the checks into MIFCO's account at Citizens. She continued this practice until February of 1990, when Brenda Alexander, one of the owners of MIFCO, discovered the embezzlement. MIFCO later sued Citizens to recover the funds that were deposited into Pagani's personal account.[4] MIFCO alleged, among other things, that Citizens converted the checks under § 3-419(1)(c) of the Commercial Law Article and that Citizens was negligent.

At trial in the Circuit Court for Prince George's County, Brenda Alexander testified that MIFCO is a small company with seven employees and that it has had an account with Citizens since 1976. She explained that MIFCO billed its customers by sending two copies of its invoice to the customer. MIFCO retained and filed a single pink copy of each invoice. Alexander testified that she instructed Pagani that when MIFCO received a check from a customer, she should retrieve the pink invoice from the file, mark it paid, and write on it the check number, the date of the check, the date the check was received, and the amount of the check. Pagani was instructed to then put the paid invoices in a "paid file." Pagani was also instructed, Alexander testified, to indorse the check by stamping the back with two stamps—one with the name and address of MIFCO and the other containing the words, "for deposit only." Pagani was then directed to deposit the indorsed checks into MIFCO's account at Citizens Bank and file a copy of the deposit slip in MIFCO's files.

Alexander testified that she specifically required Pagani to use the "for deposit only" stamp when indorsing checks and that she did not consider the MIFCO stamp to be an indorsement if it was used without the "for deposit only" stamp. She never knew of anyone at MIFCO using the MIFCO stamp as an indorsement without also using the "for deposit only" stamp; she admitted, though, that she was not always present

---

4. MIFCO also sued Pagani and her husband. This appeal, however, does not concern any issues related to those claims.

to observe how the stamps were used and later learned, after she discovered the embezzlement, that Pagani had not always used the "for deposit only" stamp. Alexander admitted that she never notified Citizens that the MIFCO stamp without the "for deposit only" stamp was not considered an indorsement.

Alexander testified that in October or November of 1989, several months after the embezzlement began, she was looking through the invoice files and discovered that there were "paid" invoices for which she could not find corresponding deposit slips. She made a list of these invoices and she later confronted Pagani about the problem. Pagani suggested that they begin stapling the deposit slips to the corresponding invoices. A few days later, Alexander stated, she checked if Pagani had complied with this suggestion and found that deposit slips were stapled to invoices. She investigated no further at that time.

Alexander related that in February of 1990 she was sorting through some papers and found the list she had made of invoices without corresponding deposit slips. When she looked for the invoices on the list, she could not find any of them. Alexander then called some of their customers in an attempt to verify that MIFCO had received all the checks that its customers had sent, and some of the customers faxed MIFCO copies of some checks. Alexander then called Pat Fowler at Citizens and asked her to verify that the checks had been deposited into MIFCO's account. After Alexander delivered the copies of the checks to the bank, Fowler researched Citizens' records. Alexander testified that a day or two later Fowler told her that the checks were deposited into Pagani's personal account. The next day, Alexander met with Fowler and an investigator from the bank to discuss the details of the scheme, and the investigator gave Alexander copies of checks that Pagani had deposited into her personal account. MIFCO's attorney also introduced copies of Pagani's bank statements and copies of the actual deposit slips Pagani allegedly used to deposit the checks into her personal account.

Alexander stated that after the meeting at the bank, she went back to MIFCO's offices, with the copies of the checks in hand, and confronted Pagani. Alexander asked Pagani if she had taken any paperwork from the office. Pagani responded that she had, and Alexander followed Pagani home to retrieve the papers. Pagani gave them several invoices, of which Alexander made a list.

Alexander acknowledged that Pagani had been the employee charged with reconciling MIFCO's monthly bank statements and that she did not always check Pagani's work. She said that she could have detected the embezzlement by totaling the invoices marked paid for the month and comparing that number to the total amount of the deposits on the bank statement (at least until Pagani started taking some of the invoices). She did check the bank statements against the deposit slips in MIFCO's files, but this failed to detect the problem because Pagani did not put her personal deposit slips into the files. Alexander also explained that MIFCO had never had any prior problems with employees stealing money from the company.

Called by MIFCO to testify, Pagani largely corroborated Alexander's testimony concerning her duties and confirmed that Alexander instructed her to indorse checks by stamping the back with both the MIFCO stamp and the "for deposit only" stamp. MIFCO's attorney read from Pagani's deposition in which she stated that she had deposited the checks in her personal account by filling out a blank deposit slip with MIFCO's name and her personal account number. The deposition also revealed that she appropriated the pink invoices that corresponded to the checks she deposited in her own account, that she never took cash back at the time of the deposit, and that she always used the drive-up window for these transactions. Pagani explained in her testimony that MIFCO's deposit slips were pre-printed while the deposit slips she used to deposit checks into her personal account were the blank slips available at the bank. She also testified that she did not always use the "for deposit only" stamp, even on some of the checks she deposited in MIFCO's account. She further

testified that Alexander was only at MIFCO once or twice a week and that she never remembered Alexander comparing the invoices to the deposit slips or the bank statements. Pagani also stated that the bank never questioned the indorsements made without the "for deposit only" stamp. She admitted that she had no authorization to deposit the checks into her own account.

MIFCO then requested that Citizens produce a representative to testify to its banking procedures. Deborah Funkhouser, an assistant vice president in charge of documenting policies and procedures for the bank, was questioned about these procedures and relevant portions of Citizens' procedural manual. No questions were asked of Funkhouser to elicit the procedures of the banking business in general or the standard of care followed in that business.

At the close of MIFCO's case, Citizens moved for judgment and the circuit court granted the motion. The court found that the indorsements were actually authorized, and were therefore not forgeries. It specifically rejected MIFCO's argument that Pagani's indorsements were unauthorized because she failed to stamp the checks "for deposit only." The court stated:

> "We're talking about simply the lack of the restrictive language for deposit only, and that has nothing to do with the [i]ndorsement. It simply limits what the payee can do with that [i]ndorsement.... What I'm trying to say is the words for deposit only is not part of the authorization to cash it. It is limiting what the payee can do with it when the payee gets it.... That does not make it a forgery."

Concerning the negligence count, the court concluded that MIFCO's total reliance on Citizens' manuals as evidence of the relevant standard of care was misplaced. The court stated: "But I don't even reach [the contributory negligence issue], because I can't find negligence and I cannot find negligence because in professional malpractice, and that's what we're talking about here, somebody has got to tell the Court what the industry standard is, and I don't know it." The court thus

indicated that MIFCO should have called an expert to testify concerning reasonable banking practices.

The Court of Special Appeals reversed. *Maryland Industrial Finishing Co., Inc. v. Citizens Bank,* 100 Md.App. 671, 642 A.2d 317 (1994). It held as an initial matter that the words "forged indorsement," as used in § 3–419, were synonymous with "unauthorized" indorsement as defined in § 1–210(43). *Id.* at 681, 642 A.2d 317. The court then implicitly held that the indorsements were unauthorized because Pagani was not authorized to deposit the checks into her own account.[5] It further held that the circuit court, by requiring expert testimony on reasonable banking standards, had erroneously placed the burden of proof on MIFCO to establish under § 3–419(3) that Citizens had not acted "in good faith and in accordance with the reasonable commercial standards" of the banking business. This subsection, the court explained, establishes an affirmative defense, and therefore the circuit court should have placed the burden of proof on Citizens.[6] We granted certiorari to consider the important issues presented by the conversion claim in this case.

## III.

As we noted above, "An instrument is converted when ... [i]t is paid on a forged indorsement." § 3–419(1). We agree with the Court of Special Appeals and numerous other courts that have held a "forged indorsement" to be the same as an "unauthorized indorsement" for the purposes of a conversion action. *Maryland Industrial, supra,* 100 Md.App. at

---

5. The court stated: "[W]e conclude that the uncontradicted evidence demonstrates that Mrs. Pagani's authority was limited to making deposits into the corporate account only." *Id.* at 684, 642 A.2d 317. It did not, however, explain how such a limitation on Pagani's authority affected her authority to indorse the checks.

6. The Court of Special Appeals apparently assumed that the circuit court was imposing the expert testimony requirement on MIFCO in connection with the conversion count, rather than the negligence count.

678–83, 642 A.2d 317.[7]  Section 1–201(43) provides: " 'Unau-. thorized signature or indorsement' means one made without actual, implied or apparent authority and includes a forgery." The code does not define these authority concepts but rather directs that "the law relative to ... principal and agent ... shall supplement its provisions...." § 1–103. *See also Reza-polvi v. First National Bank*, 296 Md. 1, 12–13, 459 A.2d 183 (1983) (discussing agency principles in the context of unauthorized indorsements); *Taylor v. Equitable Trust Co.*, 269 Md. 149, 156, 304 A.2d 838 (1973) (same).  Actual "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Restatement (Second) of Agency* § 26.[8]  This statement encompasses both types of actual authority, express and implied.

In the present case, MIFCO presented evidence that Pagani deviated from her express authority in two ways.  First, she deposited the checks in her personal account, rather than MIFCO's account.  Second, she indorsed the checks by using only the MIFCO stamp without the deposit only stamp.  We must consider whether the absence of the authority to do these two things makes her indorsement unauthorized despite

---

**7.**  *See also Equitable Life Assur. Soc. of U.S. v. Okey*, 812 F.2d 906, 908 (4th Cir.1987); *D & G Equipment v. First Nat'l Bank of Greencastle, PA.*, 764 F.2d 950, 955 (3rd Cir.1985); *Candlewood Obstetric–Gynecologic v. Signet Bank*, 805 F.Supp. 328, 332 (D.Md.1992); *Matco Tools Corp v. Pontiac State Bank*, 614 F.Supp. 1059, 1062 (E.D.Mich.1985); *Oswald Machine & Equip., Inc. v. Yip*, 10 Cal.App.4th 1238, 1243–44, 13 Cal.Rptr.2d 193 (1992); *Fort Dodge Creamery Co. v. Commercial State Bank*, 417 N.W.2d 245, 246 (Iowa App.1987); *Confederate Welding v. Bank of the Mid–South*, 458 So.2d 1370, 1373–74 (La.Ct.App.1984); *Mott Grain Co. v. First Nat. Bank & Trust Co.*, 259 N.W.2d 667, 669 (N.D.1977); *Hartford Accident and Indemnity Co. v. South Windsor Bank and Trust Co.*, 171 Conn. 63, 368 A.2d 76, 79–80 (1976); *Salsman v. National Community Bank of Rutherford*, 102 N.J.Super. 482, 246 A.2d 162, 169 (N.J.Super.Ct.Law Div.1968), *aff'd*, 105 N.J.Super. 164, 251 A.2d 460 (1969); 6A Ronald A. Anderson, *Uniform Commercial Code*, § 3–419:71 (3d. ed. 1993).

**8.**  The *Restatement (Second) of Agency* will hereinafter be referred to as the *Restatement*.

the fact that she was expressly authorized to use the MIFCO stamp to indorse checks.

## A.

■ It is clear that Pagani did not have the authority to deposit the checks into her personal account. The relevant question, however, is whether she had authority to indorse the way she did, not whether she had authority to deposit the way she did. On this issue, therefore, we disagree with the Court of Special Appeals.

A few courts in other states have held indorsements to be unauthorized because the agent later misappropriated the check, but we are not persuaded by their reasoning. *See Mohr v. State Bank of Stanley,* 241 Kan. 42, 734 P.2d 1071 (Kan.1987); *Confederate Welding, supra.* The courts in both these cases seemed to assume, without discussion, that an indorsement and the later deposit are inseparably linked together, such that both are authorized or both are unauthorized.

■ It defies reason to allow an event that occurs after the indorsement to affect the validity of the indorsement. An indorsement is either valid or invalid at the time it is made; if, at that time, the agent has authority to indorse, the indorsement is authorized. The use to which the agent later puts the check does not affect the agent's authorization to indorse it.

Courts in other states have taken this approach. The Pennsylvania Supreme Court in *Jones v. Van Norman,* 513 Pa. 572, 522 A.2d 503 (1987), viewed the indorsements of the checks and their later appropriation as two separate acts, stating:

"It is obvious that the misappropriation of the checks was unauthorized. The misappropriations, however, did not convert authorized [i]ndorsements into forgeries. The signing of the payee-principal's name on the check is either authorized or it is not. That status does not depend upon whether the authorized representative properly applies the

checks to the account of the payee or misapplies them to his own use."

*Id.* 522 A.2d at 507. Similarly, in *Willey v. Mayer,* 876 P.2d 1260 (1994), the Supreme Court of Colorado concluded:

"An otherwise authorized signature on a negotiable instrument is not converted into an unauthorized forgery when an agent, authorized to sign negotiable instruments in his principal's name, abuses that authority by negotiating the instrument to a holder in due course for the agent's own personal benefit. The question of whether the agent was authorized to pledge an instrument as security for a personal loan is separate from the question of whether the agent was authorized to sign his principal's name to the instrument in the first instance."

*Id.* at 1265. *See also Rohrbacher v. BancOhio Nat. Bank,* 171 A.D.2d 533, 567 N.Y.S.2d 431, 433 (1991) (holding that an agent's conversion of the proceeds of a check "cannot be held to retroactively render an otherwise valid [i]ndorsement a forgery"); *Bank South, N.A. v. Midstates Group,* 185 Ga.App. 342, 364 S.E.2d 58, 61 (1987) ("The question of to what use Williams was ultimately authorized to put an instrument held by Midstates after he had placed the corporate indorsement on it is separate and distinct from the question of whether he was authorized to indorse the instrument in the first instance."); *Puget Sound Nat. Bank v. Burt,* 56 Wash.App. 868, 786 P.2d 300 (1990) ("[An agent's] unauthorized act of misappropriation, however, does not render unauthorized other acts which [the principal] had expressly authorized, such as the signing of his name.").

■ Similarly, the validity of an indorsement does not depend on the agent's subjective motivation at the time of the indorsement. According to *Restatement* § 39, "Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal." Nevertheless, § 165 of the *Restatement* provides:

"A disclosed or partially disclosed principal is subject to liability upon a contract purported to be made on his

account by an agent authorized to make it for the principal's benefit, although the agent acts for his own or other improper purposes, unless the other party has notice that the agent is not acting for the principal's benefit."

### B.

We next consider the effect of the absence of restrictive indorsements. The conclusion of the trial judge that Pagani's stamp indorsements were expressly authorized even absent restrictive language was based on an assumption that restrictive language has little or no effect and is not part of an indorsement. This, however, is not the case. A restrictive indorsement obligates the next transferee to follow the instructions contained in the restrictive indorsement. § 3–206(3). Accordingly, the indorser can sue the immediate transferee in contract to recover any damages caused by the transferee's failure to abide by the restrictive indorsement. *E.g. Mid–Atl. Tennis Cts., supra,* 658 F.Supp. at 143. In addition, commentators and courts have concluded that when a depositary bank fails to follow a restrictive indorsement, the bank is liable in conversion. *C.S. Bowen Co. v. Maryland Nat'l Bank,* 36 Md.App. 26, 36, 373 A.2d 30 (1977); *Western Assur. Co. v. Star Financial Bank,* 3 F.3d 1129, 1133 (7th Cir.1993); *In Re Quantum Development Corporation,* 397 F.Supp. 329, 336 (D.V.I.1975), *aff'd on other grounds,* 534 F.2d 532 (3rd Cir.1976), *cert. denied,* 429 U.S. 827, 97 S.Ct. 84, 50 L.Ed.2d 90 (1976); *Society Nat'l Bank v. Security Fed. S. & L.,* 71 Ohio St.3d 321, 643 N.E.2d 1090, 1094 (1994); *Cairo Coop. Exch. v. First Nat. Bank, Etc.,* 228 Kan. 613, 620 P.2d 805, 809 (1980); *Salsman, supra,* 246 A.2d at 169; *AmSouth Bank, N.A. v. Reliable Janitorial Service, Inc.,* 548 So.2d 1365, 1366–68 (Ala.1989); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* §§ 15–5, 15–6 (3d ed. 1988); 6A Ronald A. Anderson, *Uniform Commercial Code* § 3–419:37 (3d ed. 1993). This conclusion is supported by the statutory language. Section 3–419(4) provides: "An intermediary bank or payor bank which is not a depositary bank is not liable in conversion solely by reason of the fact that proceeds of an

item indorsed restrictively (§§ 3–205 and 3–206) are not paid or applied consistently with the restrictive indorsement of an indorser other than its immediate transferor." By negative implication, this section suggests that a depositary bank may be liable in conversion for failing to honor a restrictive indorsement, and that intermediary and payor banks may be liable for conversion for failing to honor the restrictive indorsement of their immediate transferor. Moreover, failure to follow a restrictive indorsement results in liability for conversion because it is "an exercise of dominion and control over the instrument inconsistent with the rights of the owner." *See* § 3–419, comment 3.

█ Accordingly, a restrictive indorsement has a legal effect that is entirely different than that of an indorsement without any restriction. This has led courts to conclude that an agent who is authorized to do one is not necessarily authorized to do the other. *Coeur D'Alene Min. Co. v. First Nat. Bk.*, 118 Idaho 812, 800 P.2d 1026, 1038–39 (1990); *Trust Co. Bank of Augusta v. Henderson*, 258 Ga. 703, 373 S.E.2d 738, 739 (1988); *Bellflower Ag Serv. v. First Nat. Bank*, 130 Ill.App.3d 80, 85 Ill.Dec. 399, 473 N.E.2d 998 (1985). *See also Oswald Machine, supra*, 10 Cal.App.4th at 1246, 13 Cal. Rptr.2d 193 ("[T]he evidence submitted on summary judgment supports a reasonable inference that [the agent] had actual authority only to [i]ndorse checks in [the principal's] name for deposit to [the principal's] accounts, i.e., to make particular restrictive [i]ndorsements.").

█ Given the importance of restrictive indorsements in the relationship between the depositary bank and its customer, we hold that an unauthorized omission by an agent of restrictive language in an indorsement is sufficient to make the indorsement unauthorized.[9] If we were to hold that the

9. Assuming Pagani's indorsements were unauthorized absent the "for deposit only" stamp, MIFCO ratified the indorsements on the checks that were properly deposited into its account. When the agent has no authority to do an act, the principal may later ratify the act, giving it the same effect as if it had been originally authorized. *Restatement*

omission of the restrictive language had no effect, we would essentially place the principal-drawee's ability to recover entirely in the hands of the agent under the circumstances presented in this case. The agent could choose to disregard the principal's instructions and fail to include the restrictive language in the indorsements of checks, thus precluding the principal from recovering under a conversion theory. Or the agent could choose to indorse the checks, as instructed, with the restrictive language but nevertheless deposit them into the agent's own account, thus permitting the principal to recover under a conversion theory because the bank violated the restrictive indorsements. This variance in outcomes based entirely on the agent's obedience or disobedience is unjustifiable.[10]

In this case, the evidence consistently indicates that Pagani's express authority was limited to restrictively indorsing the checks. MIFCO's attorney asked Alexander: "Did you ever indicate to Mrs. Pagani that there were any circumstances where she was permitted to use the MIFCO [i]ndorsement stamp on checks without using the second, for deposit only?" Alexander responded: "No." The trial judge later asked Alexander: "Did you consider [the MIFCO stamp] an [i]ndorsement without the for deposit only stamp added to it?" Again, Alexander responded: "No." When Pagani testified, she corroborated Alexander's testimony in response to the following line of questioning by MIFCO's attorney:

---

§ 82. A principal can ratify an act by "a manifestation of an election ... to treat the act as authorized" or by conduct that is "justifiable only if there were such an election." *Id.* § 83. One way for a principal to ratify an act by conduct is to accept a benefit that it would not have received but for the previously unauthorized act.

10. We recognize that a bank may be more at fault for violating the instructions contained in a restrictive indorsement than it would be for taking a check on which an agent omitted the restrictive language altogether. Fault on the part of the bank, however, is not a required element of the plaintiff's case in a conversion action under § 3–419(1). Fault, or the lack thereof, becomes relevant in the affirmative defense provided in § 3–419(3). *See infra* note 13.

Q: What were you instructed by Brenda [Alexander] as to stamping the [i]ndorsement on the checks?

A: To stamp them with the Maryland Industrial stamp and for deposit only.

Q: Using both stamps, is that correct?

A: Yes.

Q: And she never indicated to you that you were permitted to use just the one MIFCO stamp, did she?

A: Not specifically, no.

Nevertheless, the trial judge, by erroneously downplaying the significance of restrictive language, found Pagani's indorsements to have been expressly authorized. Consequently, we agree with the Court of Special Appeals in its reversal of the trial court's judgment.

Yet, the question of whether the omission of restrictive language was unauthorized is a question of fact to be resolved by the trial judge sitting as the finder of fact. On this issue, Citizens has not had an opportunity to offer evidence on possible theories of implied or apparent authority. Furthermore, Citizens can attempt to invoke § 3–419(3) or any other defenses provided by the law.[11] Accordingly, the case will be remanded to the trial court for presentation of further evidence.

---

11. As we noted above, § 3–419(3) limits Citizens' liability to the amount of the proceeds from the converted check that remain in the bank, if Citizens establishes (1) that it acted in good faith and (2) that it acted "in accordance with the reasonable commercial standards applicable to the business." Because this provision essentially provides an affirmative defense, it does not impose additional burdens on the plaintiff. *E.g., C.S. Bowen, supra,* 36 Md.App. at 38, 373 A.2d 30; *D & G Equipment, supra,* 764 F.2d at 956. Therefore, the Court of Special Appeals was correct in holding that MIFCO does not bear the burden of establishing reasonable commercial standards. The Court of Special Appeals was incorrect, however, in thinking that the trial judge misplaced that burden. The trial judge's comments concerning the plaintiff's failure to establish the industry standard were clearly directed at the negligence count, under which the plaintiff had the burden of establishing reasonable commercial standards.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO ABIDE THE RESULT.*

BELL, CHASANOW and RAKER, JJ., dissent.

BELL, Judge, dissenting in opinion, in which CHASANOW and RAKER, Judges, join.

I agree that what is important in this case is "whether [the appellee's agent] had authority to indorse the way she did, not whether she had authority to deposit the way she did." Majority Op. at 460. Reasoning that "the validity of an indorsement does not depend on the agent's subjective motivation at the time of the indorsement," Majority Op. at 12, the majority correctly observes:

It defies reason to allow an event that occurs after the indorsement to affect the validity of the indorsement. An indorsement is either valid or invalid at the time it is made; if, at that time, the agent has authority to indorse, the indorsement is authorized. The use to which the agent later puts the check does not affect the agent's authorization to indorse it.

Majority Op. at 460. With this, I do not quarrel.

My quarrel is with what the majority deems to be an unauthorized indorsement in this case. According to the majority, because the appellee's instructions required its agent to use two stamps,[1] a signature stamp and one containing the

---

1. A more difficult case may be presented when only one stamp is involved and that stamp contains both the principal's signature and the language restricting what the agent may do with the proceeds. In that case, it may be argued that the only authority given is to use the indorsement stamp and that the failure to do so renders the indorse-

restrictive indorsement, "For Deposit Only," "[g]iven the importance of restrictive indorsements in the relationship between the depositary bank and its customer ... an unauthorized omission by an agent of restrictive language in an indorsement is sufficient to make the indorsement unauthorized." Majority Op. at 463–465. I do not agree. As shall be made clear hereinafter, the agent's "unauthorized omission" to use the authorized and required "For Deposit Only" stamp does not make unauthorized the agent's authorized and required use of the principal's signature stamp.

Section 1–201(43) of the Commercial Law Article, Maryland Code (1975, 1992 Repl.Vol.), defines "unauthorized signature or indorsement" as "one made without actual, implied or apparent authority and includes a forgery." A forgery is "[a] signature of a person that is made without the person's consent and without the person otherwise authorizing it." *Blacks Law Dictionary* 650 (6th ed. 1990). *See also Bank of Glen Burnie v. Loyola Fed. Sav. Bank,* 336 Md. 331, 648 A.2d 453 (1994); *State v. Reese,* 283 Md. 86, 388 A.2d 122 (1978); *Reddick v. State,* 219 Md. 95, 148 A.2d 384 (1959). Section 1–201(43) thus makes clear that to be unauthorized, a signature or indorsement must have none of the indicia of authority. This does not mean that it must be forged, however. While every forged signature necessarily is unauthorized, the converse is not true, not every unauthorized signature is a forgery.

In a subsequent title, the Commercial Law Article addresses the effect of a signature and how it may be made, § 3–401,[2]

---

ment unauthorized. That is not this case and, I venture no opinion as to the resolution of that scenario.

2. Section 3–401. Signature

(1) No person is liable on an instrument unless his signature appears thereon.

(2) A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature.

by whom it may be made, § 3–403(1),[3] and the effect of an unauthorized signature.[4]

A similar treatment is accorded the term "indorsement." Title 3, subtitle 2 addresses specific kinds of indorsements. Section 3–204 is concerned with special indorsements and blank indorsements. It provides:

(1) A special indorsement specifies the person to whom or to whose order it makes the instrument payable. Any instrument specially indorsed becomes payable to the order of the special indorsee and may be further negotiated only by his indorsement.

(2) An indorsement in blank specifies no particular indorsee and may consist of a mere signature. An instrument payable to order and indorsed in blank becomes payable to bearer and may be negotiated by delivery alone until specially indorsed.

(3) The holder may convert a blank indorsement into a special indorsement by writing over the signature of the indorser in blank any contract consistent with the charter of the indorsement.

Section 3–205 defines restrictive indorsement as one which either

(a) Is conditional; or

---

3. Section 3–403. Signature by authorized representative.

(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority.

    \*     \*     \*     \*     \*     \*

4. Section 3–404. Unauthorized Signatures.

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

(2) Any unauthorized signature may be ratified for all purposes of this title. Such ratification does not of itself affect any rights of the person ratifying against the actual signer.

(b) Purports to prohibit further transfer of the instrument; or

(c) Includes the words "for collection," "for deposit," "pay any bank," or like terms signifying a purpose of deposit or collection; or

(d) Otherwise states that it is for the benefit or use of the indorser or of another person.

The effect of a restrictive indorsement is treated in section 3–206. As relevant to the issue *sub judice,* it provides that, to be a holder for value, "any transferee under an indorsement which is conditional or includes the words "for collection," "for deposit," "pay any bank," or like terms ... must pay or apply any value given by him for or on the security of the instrument consistently with the indorsement...."

Subtitle 4 of Title 3 is where the liability of the parties to a commercial transaction is addressed. As the majority accurately points out, the critical provision for our purposes is § 3–419(1)(c), which holds a bank who pays a check on a forged indorsement liable for conversion. Because, for purposes of this section, however, an unauthorized signature is treated the same as a forged one, the critical question when a signature is not a forgery involves the extent of the authority of the agent who signed the check on behalf of the payee. This issue is resolved by reference to § 3–202, which provides:

(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery.

A "holder" receives the instrument "drawn, issued or indorsed to him or his order or to bearer or in blank." § 1–201(20). *See also* § 3–302 (holder in due course).[5] An instrument is

---

5. § 3–302. Holder in due course.

(1) A holder in due course is a holder who takes the instrument
(a) For value; and
(b) In good faith; and

payable to order "when by its terms it is payable to the order or assigns of any person therein specified with reasonable certainty, or to him or his order. . . ." § 3–110(1). To be negotiable, § 3–202(1) makes clear, a check paid to order must bear the signature of the person to whose order it is payable. Thus, while "indorsement" is not synonymous with signature, and, indeed, may consist of a signature, a special indorsement and/or restriction on the use of the proceeds, for negotiation purposes, "any necessary indorsement" recognizes and, in fact, contemplates an indorsement in blank, *i.e.* "a mere signature." *See* § 3–204(2).

In this case, the checks that Pagani deposited to her own account were made payable to the appellee; they were payable to order. To negotiate those checks so that their proceeds could be deposited in the appellee's account required the appellee's valid signature. Pagani expressly was given authority to place the appellee's signature on those checks and deposit their proceeds in the appellee's account. That authority was expressed by the appellee in terms of requiring Pagani to use two stamps, one of which was a signature stamp. Pagani was, therefore, as the trial court concluded, expressly authorized, by use of the signature stamp to place on the checks the signature necessary for their negotiation. That authority did not dissipate simply because Pagani did not also use the restrictive indorsement stamp. That is particularly the case when, as here, the restrictive indorsement stamp, was not always used when the deposits were made to the proper account. It is no answer, as the majority suggests, that, as to the latter transactions, the appellee ratified the unauthorized signature. See Majority Op. at 465 n. 11. If there were a ratification, logically, from the appellee's perspective, it was of all such "unauthorized signatures." I believe that the appellant bank properly negotiated those checks presented to it stamped with the company's signature.

---

(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

If, as the majority recognizes, "[t]he use to which the agent later puts the check does not affect the agent's authorization to indorse it," Majority Op. at 460, *i.e.*, the agent's misappropriation of the funds is irrelevant to her authority to negotiate the check, then, surely, the vehicle by means of which the misappropriation is effectuated can have no greater affect on the validity of the indorsement and, thus, the check's negotiability. In this case, being authorized to indorse the appellee's checks with its signature stamp, Pagani simply omitted to follow the instructions of her principal to use the second stamp she was required and authorized to use. While that omission enabled Pagani to misappropriate the funds—it was the means by which Pagani was enabled to deposit the company's funds into her account—it formed no part of the indorsement. Indeed, it was just another event occurring subsequent to the indorsement for purposes of negotiation. As such, it simply could not affect the validity of the appellee's signature.

The culpability of an agent who disobeys his or her principal's instructions and, thereby, misappropriates his or her principal's funds is the same no matter how that disobedience is manifested. Boiled down to its basics, the authority given in this case was to deposit the appellee's checks in the appellee's account. That the appellee instructed the agent as to the details of how that was to be accomplished, *i.e.* telling her to use particular stamps to indorse the check, does not change the nature of the instruction. It certainly does not provide a principled basis for differentiating the agent's responsibility.

The cases upon which the majority relies for the proposition that the relevant question is the authority to indorse, rather than where the money is deposited, fully support the result I would reach. As stated in *Jones v. Van Norman*, 513 Pa. 572, 522 A.2d 503 (1987):

The signing of the payee-principal's name on the check is either authorized or it is not. That status does not depend upon whether the authorized representative properly applies the checks to the account of the payee or misapplies them to his own use.

*Id.* 522 A.2d at 507. Similarly, in *Bank South, N.A. v. Midstates Group,* 185 Ga.App. 342, 364 S.E.2d 58 (1987), the court wrote:

> "[t]he question of what use Williams was ultimately authorized to put an instrument held by Midstates after he had placed the corporate indorsement on it is separate and distinct from the question of whether he was authorized to indorse the instrument in the first instance."

*Id.* 364 S.E.2d at 61. *See also Great Southern Nat. Bank v. Minter,* 590 So.2d 129 (Miss.1991) (indorsement authorized despite misappropriation of funds). And *Oswald Machine Equip., Inc. v. Yip,* 10 Cal.App. 4th 1238, 13 Cal.Rptr.2d 193 (1992), upon which the majority heavily relies to establish that "an agent who is authorized to do one [act] is not necessarily authorized to do the other," Majority Op. at 15, is inapposite. There the agent indorsed checks with name stamps of fictitious businesses and then deposited those checks into an account opened under those fictitious names. The agent did not, in other words, use the principal's authorized stamp; unlike in the case *sub judice,* in that case, the agent's indorsement clearly was unauthorized.

I agree with the majority. There are consequences associated with the failure to comply with a restrictive indorsement. *See* § 3–206(3) (transferee is holder for value only to extent that payment or value is given consistently with indorsement). Thus, as the majority points out, a transferee is answerable in contract, to its immediate indorser, for damages caused by failing to comply with any restrictions contained in the indorsement and a depository bank [6] is liable in conversion for the same reason. *See* § 3–419(4) ("An intermediary bank or payor bank which is not a depository bank is not liable in conversion solely by reason of the fact that proceeds of an item indorsed restrictively ... are not paid or applied consistently with the restrictive indorsement of an indorser other than its immediate transferor."). A restrictive indorsement is

---

6. "Depository Bank" is "the first bank to which an item is transferred for collection...." § 4–105(a).

not, however, any part of the "necessary indorsement" for purposes of negotiation. What is required to negotiate a check is that the check be transferred so that the transferee becomes a holder. A transferee is a holder of a check indorsed in blank. An indorsement in blank may "consist of a mere signature." *See* § 3–204(2). Moreover, the absence of a restrictive indorsement does not render the negotiation ineffective. As § 3–207(1)(d) makes clear, "[n]egotiation is effective to transfer the instrument although the negotiation is ... [m]ade in breach of duty." In short, while consequences flow from the failure of a transferee, in this case the appellant bank, to comply with an actual, disclosed restrictive indorsement, the same consequences do not follow from the failure of the indorser to include the restrictions in the indorsement. In that latter circumstance, the check is appropriately and validly negotiated. To the extent the transferee gives value, acts in good faith, and without notice of defenses,[7] it is a holder in due course. § 3–302(1).

The majority makes much of the fact that, if the omission were not noticed by this Court, "the principal—drawee's ability to recover [would be placed] entirely in the hands of the agent under the circumstances presented in this case." Majority Op. at 464. The argument is curious inasmuch as the method an agent chooses to breach his or her duty to the principal always impacts the principal's liability or right to recover. Under my approach, however, what approach the agent uses to breach his or her duty is not an issue. I repeat, as I see it, the agent in this case simply breached her duty to her principal. That does not impact the authority she was expressly given to place the appellee's signature on checks paid to the appellee's order. That the instructions specifically addressed the method by which the misappropriation was

---

7. There is no dispute that the appellant gave value. The other two requisites are also established on this record. There is no suggestion, and certainly no evidence that the appellee informed the appellant of the instructions it gave its agent—that it authorized only the use, in tandem, of two stamps and that any indorsement that was not strictly in compliance with those instructions was unauthorized.

effected does not change the question from one of misappropriation to one of authority.

It is quite likely, as the majority suggests, that the bank ultimately will prevail in this case, in light of § 3–419(3).[8] That, however, does not answer the question this case presents. In my opinion, the bank should not be called upon to establish its entitlement to the benefit of § 3–419(3) unless and until the agent's lack of authority to indorse the check has been shown. Where the evidence is clear, as here, that the appellee authorized the agent to use its signature stamp and the agent did so, express authority has been shown, notwithstanding the agent's failure to use another authorized stamp.

I dissent.

CHASANOW and RAKER, JJ., join in the views herein expressed.

---

8. Who better than the businesses that authorize their agents to indorse checks are in a position to avoid loss? In this case, MIFCO had several mechanisms at its disposal to "police" such losses. It could have given its agent only one stamp; it could have notified the appellant of its indorsement procedures; it could have checked its books internally, periodically, for any losses. MIFCO apparently had no system. Surely then, it is MIFCO that should bear the loss. *See* § 3–406, which provides:

> Negligence contributing to alteration or unauthorized signature.
> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Comment 7 to that section notes that "[t]he most obvious case is that of the drawer who makes use of a signature stamp or other automatic signing device and is negligent in looking after it." That rather clearly describes this case.